| 69  245|
| 69  853|

F. B. KING v. ILLINOIS CENTRAL RAILROAD CO.

1. RAILROAD SUPERVISION. *Act of* 1890. *Agents conservators of the peace.*

The act of February 22, 1890 (Laws, p. 106), constituting depot agents in this state conservators of the peace, with authority to preserve order in waiting-rooms, and power to make arrests, does not make them officers of the state, but merely enlarges and defines their duties as agents of the railroad companies.

2. RAILROADS. *Arrests by depot agent. Responsibility of company.*

For the proper and lawful exercise of this authority the railroad companies are responsible, and if a depot agent arrest one not guilty of disorderly conduct or otherwise liable to arrest under said statute, the company is liable for the false imprisonment, although the agent had no express instructions from it to make arrests, and supposed he was acting as an officer of the state.

3. SAME. *What is "disorderly conduct." Case in judgment.*

The authority conferred by said statute upon depot agents to arrest those guilty of disorderly conduct in waiting-rooms will not justify the arrest of a passenger who is a stranger, and who, after failing to find the gen-

tlemen's water-closet, outside the main depot building, impelled by necessity, has resort to the water-closet intended and designated for "ladies only," and opening into the ladies' division of the general waiting-room.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

Appellant, King, brought this action for damages against the Illinois Central Railroad Co., alleging that he had been unlawfully arrested and imprisoned by the depot agent of said company at Jackson, Miss.

The facts developed on the trial were substantially as follows: King was on a north-bound passenger-train of the defendant, intending to pass through Jackson on his way to Memphis, where he expected to make an immediate connection with another train for St. Louis, which was his home. Before reaching Jackson, it was suggested by the conductor that King could not make the desired connection at Memphis if he continued on that train, as the schedules had been changed. Upon reaching Jackson, the conductor and King made further inquiries as to the schedules, when, finding that the connection would be missed, at the suggestion of the conductor, King stopped over, intending to take passage on the Alabama & Vicksburg train, in the hope of reaching Memphis sooner. He arrived at Jackson at 1 o'clock A.M., and the train for Vicksburg was expected to leave at 4 o'clock A.M.

The defendant company has at Jackson a commodious passenger-depot, which is also used by the Alabama & Vicksburg Railway Co., and the whole was in charge of a depot master, employed by the defendant, but who acted for both companies. In one end of the depot building was a general waiting-room for white passengers. This was separated into two divisions or compartments by a combined partition and arch, one side or division being used as a waiting-room for men and the other for ladies. Opening into the latter there

was a water-closet, intended only for ladies, and on the door of this was posted a notice, "for ladies only." This had previously been provided to meet a special requirement of the state railroad commission. The water-closets for men were in a small and separate building very near the depot building at its opposite end from the waiting-room, and there was evidence to show that notices were posted near the ticket-windows and on the bulletin-board that keys to this closet could be had on application, but this evidence was controverted.

After being for some time in the waiting-room, King, being a stranger, inquired of one supposed to be in the employ of the company the way to a water-closet, and the person pointed in the direction of the above-mentioned closet for men. But King, after walking around to the end of the building, as he testifies, failed to see any water-closet, and returned to the waiting-room. Being there impelled by necessity, he had resort to the ladies' water-closet, and was occupying it when the porter of the depot knocked at the door and demanded that he come out. There is some conflict in the evidence as to what then occurred. King testifies that he promised to come out in a moment, and did so, and was met by the depot master, who upbraided him, and, when asked by King why a closet had not been provided for gentlemen, replied that he would take him to jail, and, when King protested, the depot master seized him, and at once dispatched the porter for a policeman. According to the testimony of the depot master, King refused to come out of the closet when demanded, and insisted on his right to use it because there was no closet in the waiting-room for men, protesting at the time that he would not go around the building to hunt for one. There was some evidence tending to show that King was somewhat under the influence of liquor, but King denies this, and is confirmed by other testimony. The depot master further testified that he made the arrest believing it was his duty to do so as a conservator of the peace.

By section 2 of the act of February 22, 1890 (Laws, p. 106), it is provided as follows: "That depot or station agents of the different railroad companies in this state shall be, and they are hereby, constituted conservators of the peace, with authority to preserve order in the waiting-rooms in their respective stations; and it shall be their duty to arrest and deliver to the custody of the most convenient sheriff or constable, or other proper officer, all persons who are guilty of disorderly conduct, and all loafers or vagrants who may frequent such waiting-rooms when not there as passengers; and all such persons shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished as is provided for the offense named in section 1 of this act."

After arresting King, the depot master gave him over to the custody of a policeman, assuring the latter that he would be present at the mayor's court when it met at nine o'clock to prefer a charge against King. The latter protested earnestly, both to the depot master and the policeman, against being imprisoned, and demanded the right to furnish bail for his appearance before the mayor, but the policeman replied that he was not permitted to accept bail in any case.

King was confined in the county jail, which is used likewise for city prisoners. No mayor's court was held that morning, because of the absence of the mayor and the illness of the mayor *pro tem.*, but the depot master appeared at the usual hour for the meeting of the court, ready to prefer his charge against King. The latter, meantime, was kept in jail, as it was hoped that the mayor *pro tem.* would be well enough to entertain a charge against him that afternoon; but the chief of police, learning that King had employed counsel and was about to resort to *habeas corpus* proceedings, released him after he had been in jail thirteen hours, and no charge against him was ever preferred, nor was he further molested.

Many questions arising out of the admission and exclusion of evidence are presented in the record, but in view of the

opinion of the court, which is made to turn upon a single point, it is not deemed necessary to set out the evidence at great length.

It was contended by the defendant that section 2 of the act of 1890, above quoted, and which is a part of the railroad supervision laws of this state, constituted depot or station agents officers of the state, and that railroad companies were not responsible for unwarranted arrests made by them as conservators of the peace. The circuit court was of the opinion that this question was determinable by the inquiry whether the depot master, in making the arrest, was attempting to serve the railroad company or attempting to execute the mandate of the legislature, and that this was a question of fact. The depot master was therefore allowed to testify as to the motive that actuated him in making the arrest, and, as he testified that he acted under a sense of his duty as enjoined by the statute and not under any instructions from the railroad company, and, as there was no direct evidence in the case in conflict with this testimony, the court, on the application of the defendant, granted a peremptory instruction in its favor. Verdict and judgment accordingly, and plaintiff appeals.

*Calhoon & Green*, for appellant.

The offense of appellant, if any, was merely a trespass. That was the complaint of the porter upon which the depot master acted. No other offense was spoken of. The arrest was not for drunkenness, and it is not even contended that appellant was intoxicated. The policeman, whose duty it was to arrest appellant if drunk, would not take the prisoner until the depot master assured him he would prefer a charge and produce the witnesses. There was no "disorderly or boisterous conduct," no breach of the peace, actual or threatened, to justify arrest without warrant. King was not informed of the offense nor allowed to explain, and the only charge ever made was the information given by the depot

master that the charge would be " drunkenness and trespass-
ing." The charge of drunkenness was wholly untrue, and
the real ground for the arrest, trespassing, a mere civil injury.
The depot master will be deemed to have made the arrest,
not the policeman. If the policeman accepts the custody
only on condition that the party causing the arrest assumes
responsibility, the latter will be liable if the arrest is unwar-
ranted. 1 Waterman on Trespass, 281, 282; 32 N. J. L., 70.

The power conferred by the act of 1890 upon the depot
master to make arrests is no protection. A *bona fide* mistake
of fact may entitle to such protection. *Roberts* v. *Orchard*, 2
H. & C., 769; *Poulton* v. *R. R. Co.*, 2 L. R., Q. B. Cas., 536.

It is not here claimed that the depot master honestly be-
lieved that King was drunk. The only defense is a mistake
of law, and, under these authorities, that is not sufficient.
The depot master was defendant's servant to preserve order.
Ordinarily, the company would be liable if he made an ar-
rest within the apparent scope of his authority; and if to
escape liability the company invokes a statute making it the
duty of the agent in *certain states of case* to arrest, it must
show that the arrest was for the very cause named in the
statute, and in the manner there prescribed. If the power
exists, and the act is apparently within the scope of the power,
it will be imputed to the power, though defectively executed,
rather than to an unauthorized source. *Yates* v. *Clarke*, 56
Miss., 212.

The true intent of the act of 1890 was to impose duties
upon the corporation for the protection of the traveling pub-
lic—to compel the corporation to perform its duty. The
duty here is required by law, but it is still the duty of the
corporation, for breach of which it is liable. The statute
did not intend to constitute depot agents conservators of the
peace so as to make them state officers. This could not be
done under the constitution, for the election and appointment
and eligibility of such officers is regulated by the constitution.
See Art. 6, sec. 22; Art. 1, sec. 29; Art. 7, sec. 4; Art. 12,

secs. 2, 26; Art. 4, secs. 16, 17, 18; 1 How., 351; 41 Miss., 359. The sources of the act of 1890 may be found in the language of the English statute, chapter 2, sections 103, 104 and 154, 8 Vict. See *Moore* v. *R. R. Co.*, 8 L. R., Q. B. Cas., 37.

If a statute require something to be done by the servant of a corporation, it becomes part of the duty of the servant to the corporation as its master, and for a breach of duty the latter is liable. *Guardians Poor* v. *Vestry*, 2 L. R., Q. B. Div., 145; *Goff* v. *R. R. Co.*, 107 E. C. L. Rep., 672; *Moore* v. *R. R. Co.*, 8 L. R., Q. B. Cas., 36; 5 *Ib.*, 640, 415.

There is no incompatibility in holding that the agent may be an officer, and also be one for whose acts the corporation is liable. 28 Eng. & Am. Ry. Rep., 138 s.c. 140 Mass., 573; 133 Mass., 15; 148 *Ib.*, 122.

In all these cases it was held to be a question of fact for the jury to say what function was exercised, and the justification must be strictly within the terms of the statute. In any view, it was error to grant the peremptory instruction.

*J. B. Harris*, for appellee.

The policy of the legislature has been to enlarge the powers of the railroad commission. It has passed beyond the regulation of tariffs, to deal with matters relating to the comfort and personal protection of the public. In 1884 the legislature authorized the commission to see that comfortable waiting-rooms were provided. Two years later it gave the commission the entire control of the matter of depots. In 1890 it went further, and placed on the trains and in the depots state officials—not only empowered them to arrest, but made it their *duty* to arrest all persons guilty of disorderly conduct. The act constituted depot agents conservators of the peace. They could not by plainer language be made public officers. They represent the majesty of the law as agents of the state in its scheme of supervising railroads for the public comfort, convenience and protection. No discretion is given to agents. They are required by law to arrest the offenders, and the

commission has required a circular address to the public to be posted in each waiting-room, to the effect that station agents are conservators of the peace, and required to make such arrests. The statute imposes liability for punitive damages on a railroad company disregarding its provisions. This power was not conferred for the protection of the railroad company, for the law would not punish a corporation for merely neglecting its own interests.

The language of the English statute, and the decisions under it, referred to by appellant, differ widely from our statute, in these respects: (1) That act was solely in the interest of railroad companies, intended for their protection in a matter in which the public had no concern. (2) Under that act arrests were not obligatory. (3) It did not confer power to make arrests on any particular officer of the company, but on all persons acting in its behalf.

The railroad commission made a special order requiring a separate waiting-room and water-closet for ladies, so that these were a creation of the statute as well as the officer in charge of them. Disorderly conduct in waiting-rooms is made a misdemeanor—a violation of state law, not merely of the rules of the company, punishable as a public offense, and at the instance of certain officers created by the statute. King was guilty of disorderly conduct, since his conduct was contrary to law. 5 Am. & Eng. L., 692.

In making the arrest in this case, the depot master acted solely for the state. He had no authority from the company, and the company gave him no discretion, to arrest any one. The agent testified that he acted as conservator of the peace, thinking the orders of the railroad commission would protect him. His testimony was not controverted, and it was right to withdraw the case from the jury. Authority in an agent cannot be created by mere presumption. It must exist in the intention of the principal; otherwise it cannot exist. Mechem on Agency, 274.

Agency extends no further than is necessary for the dis-

charge of the duties ordinarily belonging to it. 2 Greenl. Ev., § 64. Authority to commit a trespass does not result from implication of law. The only authority presumed by law is authority to do lawful acts belonging to the agent's employment. *Ib.*, § 66.

We find no American case in point here on the main question involved, except *Tolchester Beach Improvement Co.* v. *Steinmeier*, 72 Md., 313. In that case the officer, while commissioned by the governor, was nominated and paid by the company, and he was appointed to protect its property and conserve the peace on its premises.

Depot agents, being expressly authorized by statute to make arrests, have all the common law authority of constables or peace-officers in waiting-rooms, and they are not liable for making arrests except under circumstances where such officers would be liable. See 118 Ind., 41; 95 *Ib.*, 469; 86 N. C., 583; 16 Tex. App., 76; 86 Mo., 371; 7 Am. & Eng. Ency. L., 675.

Argued orally by *M. Green*, for appellant, and *J. B. Harris*, for appellee.

CAMPBELL, C. J., delivered the opinion of the court.

We reject the view that depot or station agents of railroad companies are, by "An act to amend the railroad supervision laws of this state," approved February 22, 1890, made officers of the state, and its representatives in the exercise of the powers conferred, so as to relieve their principals from responsibility for their acts. The act cited creates the power and the duty prescribed to be exercised and performed by depot or station agents, as such, and for their principals. Under the act, they are neither more nor less than depot or station agents, with the additional power and duty prescribed by it, to be exercised and performed for and in behalf of their employers. The language of the act excludes the theory that they are made officers, for it provides that they shall "arrest

and deliver to the custody of the most convenient sheriff or constable, or other proper officer," etc., thus showing that the power devolved on them is to be exercised at their place of business and in their capacity as its supervisor. The act is a part of the scheme of railroad supervision by the state, and its effect in the matter now being considered is to make it the duty of railroad companies, through their depot or station agents, to preserve order in the waiting-rooms in their respective stations. It is made a company or corporate duty, to be performed by the designated representative of the company, and for the performance or non-performance of which the company is responsible. Neither the company nor the agent can avoid or shift the responsibility. It is fixed by law, and is not dependent on the action of the company or the view of its officers or agents. Every depot or station agent, whatever may be his instructions or his understanding, is made a conservator of the peace, " with authority to preserve order in the waiting-rooms," and the duty to arrest and deliver to some officer "all persons who are guilty of disorderly conduct," etc. The manifest purpose of the legislature was to secure the preservation of order in the waiting-rooms through the designated officer or agent of the railroad company, and what he does or fails to do in reference to this duty is imputable to the railroad company as its act or omission.

What is "disorderly conduct," within the meaning of the act, so as to authorize arrest, is to be determined from a consideration of the subject-matter dealt with by the legislature, and the evil intended to be guarded against. We will not attempt to define it. Each case must be governed by its own facts. " Circumstances alter cases." The law should be so interpreted and administered as, on the one hand, not to unduly fetter the depot or station agent in the discharge of the duty to preserve order in the waiting-rooms under his care; and, on the other hand, to protect the citizen against an unwarrantable interference with his liberty. Generally,

it will not be difficult to distinguish and characterize the conduct so disorderly as to call for arrest.

It does not appear from the record that there was a determination by the circuit court of the question, whether or not the plaintiff was guilty of disorderly conduct warranting his arrest, for the case was disposed of by the view that the railroad company was not responsible in any event for the arrest. Therefore, the question as to the justifiableness of the arrest is involved in our consideration of the case only by the fact that, if it was clearly justifiable, the party would have no ground of complaint. It seems probable that the learned circuit judge did not consider the arrest as justifiable, and in this view we concur; but, disagreeing with him as to the other question, the judgment cannot stand.

*Reversed and remanded for a new trial.*