Dickson *et al. v.* Waldron.

No. 15,934.

DICKSON ET AL. *v.* WALDRON.

135   507
138   161

MASTER AND SERVANT.—*Manager of Theater.*—*Special Duty to Patrons.*
—*Liability for Acts of Servants.*—Managers of theaters, who invite
the public to become their patrons and guests, owe a special duty to
those who may accept such invitation, to protect them from injury
while present on such invitation, and especially that they shall not
suffer wrong from the agents and servants of those who have invited
them; and, in such case, the master is liable for the wrongful acts
of the servant toward the guest or patron, whether such acts be per-
formed in the line of his duty or not.

SAME.—*Theater.*—*Duty of Servant to Preserve Order, etc.*—*Discretion of
Servant.*—*Liability for Discretionary Act of Servant.*—In such case,
where the duty of a servant was to preserve order in the theater,
and to remove offensive patrons, or guests, the servant must, of
necessity, be the judge as to whether the conduct of a person is such
as to require his removal; and if the servant makes a mistake, and
unjustly attacks and injures an inoffensive patron, the master must
respond, and the fact that such servant was also a special police-
man, can avail the master nothing.

WITNESS.— *Competency.* — *Question for Trial Court.* — *Discretion.*—
Whether, at the time of a trial, a witness is competent to testify, is
a question that must be decided by the trial court, and will not be
reviewed unless there is an abuse of discretion shown.

Opinion on petition for rehearing by HOWARD, J.

From the Marion Superior Court.

*W. H. H. Miller, F. Winter, J. B. Elam, B. K. El-
liott, W. F. Elliott, P. Norton, R. O. Hawkins* and *H.
C. Smith,* for appellants.

*O. Gresham, J. B. Kealing* and *M. M. Hugg,* for ap-
pellee.

HOWARD, J.—On October 1, 1887, and at the time of
the bringing of this suit, appellants were the lessees and
managers of the Park Theater, in the city of Indianap-
olis. At the entrance to the theater, about three feet
from the sidewalk, a flight of stairs ran up to a landing,
at the rear of which was the box office for the sale of

tickets. At either side of the landing a flight of stairs led up to the east and west entrance doors to the theater. At the top of the first flight of stairs, at the edge of the landing, gates were placed, four feet high, to keep the crowd back. Between these gates was an opening, where the chief officer of the theater, named Klingensmith, an employe of appellants, stood while the crowd was coming up, after which the gates were opened, and this officer went to keep order in the gallery.

Appellants also managed and controlled other theaters in Indianapolis and elsewhere, and, in their absence, John Dickson, brother of the appellant George A. Dickson, was the general manager of Park Theater, acting for appellants. He also assisted in selling tickets.

John M. Kiley was the head janitor of the theater, and lived, with his family, in the theater building. He was also doorkeeper, and stood at the west door, but could leave in case of emergency. At the request of appellants, he was granted special police powers by the metropolitan board of police of the city of Indianapolis, such powers to be exercised at the Park Theater. He received his pay from appellants. He had been in the employment of appellants at the theater before receiving his police powers, and his pay was not increased after receiving such powers. Appellants requested his appointment at the suggestion of the chief police officer, Klingensmith, for the purpose of assisting him in preserving order in the theater. He was not relieved of any of his duties in the theater after being appointed special policeman. His instructions from appellants were not to make any arrests, except to assist Klingensmith, unless otherwise ordered by appellants, or by John Dickson. In Klingensmith's absence, Kiley acted for him.

Joseph Gordon was treasurer and ticket seller for the theater.

Dickson *et al. v.* Waldron.

On the evening of October 1, 1887, Joseph Gordon was in the box-office selling tickets. John Dickson was also in the box-office assisting in the sale of tickets.

On that evening appellee, who was a conductor on the Indianapolis, Decatur and Western Railroad, came with four friends to attend an entertainment at the theater. Appellee testifies that he went up stairs to the ticket office and called for a ten cent ticket; that he gave the ticket seller, Joseph Gordon, a silver dollar, and received from him his ticket and only seventy cents in change; and that another of the party, named Doran, also had some misunderstanding as to the purchase of his ticket.

The testimony of appellee then proceeds: "I do not remember just exactly whether Doran had purchased his ticket before me or after I did. He wanted a ticket to go up stairs, too, and they gave him a ticket to go down stairs, and I says to the ticket seller like this, I said, 'Here is five of us in a party, and want to go together; you have made a mistake in our tickets.' He said, 'What is the matter with you? Get away from that window and give others a chance.' I said, 'I am not going until I get my right change. You have made a mistake in my change, too,' and held out my hand—I had not taken my hand down from the shelf in front of the window— and he reached through the window and grabbed my change and ticket and slapped me in the face at the same time, and said, 'Damn you, get away from that window;' and reached for my brakeman and grabbed his ticket, and said, 'Police,' or 'Johnny,' I do not know which, 'Police,' or 'Johnny, arrest that man for a vag.' A man named Kiley, there, a private policeman for the theater company, stepped up at the side of me, or behind me, and knocked me down."

He testifies that the first blow was on the left forehead, which knocked him partly down on his left elbow; that

when he attempted to rise Kiley struck him again; that altogether he was struck six times on the head, three times on the left shoulder, and twice on the left forearm; that during this time Kiley said nothing to him, but that he asked Kiley what he was beating him for, "and I said if he had anything to arrest me for, to arrest me, and for God's sake not to beat my brains out."

Somebody then interfered, and Kiley for the time withdrew, and then Gordon came out of the ticket office and grabbed appellee about the neck with his left arm, and began pounding him in the face with his fist, then knocked him down and kicked him two or three times; that Kiley then arrested him, and sent him to the police station.

The testimony of appellants' witnesses as to the transaction differs in almost all the details from that given by appellee, but not in the main facts; that is, the beating of appellee in front of the ticket office by Gordon and Kiley; that the quarrel resulted from disputes as to the purchase of tickets; that both assaults were made upon appellee before his arrest by Kiley, and that appellee did not strike either of his assailants.

The testimony of Joseph Gordon and John Kiley shows their treatment of appellee to have been most brutal. Gordon testifies that he and John Dickson were in the ticket office when appellee came up and threw down a silver dollar and asked for a ticket, not specifying what priced ticket; that he gave him his ticket and the proper change. His testimony then proceeds: "He," Waldron (appellee), "said, 'You did not give me my right change.' I said, 'Yes, sir.' He said, 'No, sir.' I said, 'I gave you just the exact change with your ticket, and if you did not get your change somebody else got it.' He said, 'You did not.' I said, 'I did.' * * * I sold two or three tickets while he stood there arguing." That ap-

pellee then called him a vile name. "I said, 'Be careful, I won't take that off of anybody; you or anybody else.' He said, 'I want my change.' I said, 'Your change was right, and if it is not, when we make up the house our cash will show it, and if there is any over we will make it good to you.'" That thereupon appellee repeated the vile name, and Gordon went out of the ticket office and attacked appellee. "He was standing up pretty near the office, and I hit him, and he turned around and squared and I hit him again. * * * I could not say how hard I hit him; I hit him pretty hard; I tried to. * * * In the face." That there was nothing said between them after Gordon came out of the office. "Then we got on over to the stairway, and I hit him again, and got my arm around his neck, and we were about three or four steps down from the top. * * * I caught him around the neck with my arm and pulled him down. * * * I got him down on the stairway and hit him two or three times more, and I kicked him a couple of times. * * * I hit him in the face. * * * I hit him three or four times there, and kicked him, and then he said, 'I have enough.' * * * Mr. Kiley was down stairs at the time, out on the sidewalk. * * * I had quit when he halloed, 'I have enough.' * * * Kiley was coming up when he said that, and I said, 'Kiley, arrest this man.' When Kiley came up "I started to let go when (some) fellow said, 'Give it to him.' Kiley hit him with the mace." That when Kiley hit Waldron (appellee) the latter was "partially down; just about half way up. * * * I was very near up on my feet. * * * When Kiley came up and hit him, I let go of him, and went up stairs and went into the offie and sold tickets."

The witness Adkins, who was ticket-holder at the east door, testified: "I thought I would go down and see

Dickson *et al. v.* Waldron.

and stop that fussing if I could.   *   *   *   They had hold of each other when I got there.   *   *   *   I just stooped down and put my hand under their shoulders and assisted them.   *   *   *   Just as I was in the act of raising them up I threw my eyes down the stairway and saw Mr. Kiley coming up, and just about the time they got straightened on their feet Mr. Gordon said to Mr. Kiley, 'Arrest that man.'   Mr. Kiley came up to him and I saw Mr. Kiley throw up his left hand   *   * * and the next I saw he struck him   *   *   *   with his mace.''

Kiley himself testified that the appellant Henry M. Talbott, had instructed him that his ''duties were to take tickets at the door and supervise the cleaning of the house and assist Mr. Klingensmith in making arrests, or preserving order.''   That sometimes, when employes would come to him and tell him that there was a disturbance in some part of the house, he would go there.

As to the disturbance, he testified:   ''I was walking up the stairway and happened to glance up, and I saw Mr. Gordon having a fight, fighting with a man on the stairway.   *   *   *   The man's head was up against the casing on the west side of the stairway.   *   *   * He was sitting facing me as I came up.   *   *   *   He (Gordon) was on the step above him, and had hold of of him   *   *   *   I did not hear the man say anything; Gordon only said, 'Arrest this man.' ''

''What did you do after striking Mr. Waldron?''   ''I arrested him.''

John Dickson had remained, during the whole time, in the ticket office, and had seen the greater part of the conflict, as detailed by Gordon and Kiley, and, in his testimony, corroborates most of their statements.

He says:   ''I went on selling tickets and took no further notice of it; things of that kind are liable to oc-

cur every once in a while.'' That he remained selling tickets; did not go out during the whole trouble; did not say anything to Gordon when he first told him what the trouble was; did not give any directions to anybody; saw Kiley coming up the stairs to where Gordon had hold of Waldron, and they were struggling and partly raised up, getting on their feet. ''I do not think I said anything to him (Kiley). * * * I went on selling tickets.''

The appellant George A. Dickson testified that Kiley was not to assist in any arrest unless called upon by Klingensmith, or unless under instructions of appellants, or of John Dickson; that John Dickson acted for them in their absence.

The appellant Henry M. Talbott testified that he agreed with the evidence given by his coappellant, and that the answers given by him were correct. He stated further that while Kiley was in the theater he generally did what appellants told him, but was not sure that he gave Kiley orders, personally, that ''John Dickson was deputized to look after that.''

John Dickson was not only present on this occasion, but was generally at the theater during entertainments. He testified that he ''wore off his vest,'' leaning against the inside shelf of the ticket office. He acted for appellants in signing the firm name to the request made for Kiley's appointment as policeman.

This request was as follows:

''*To the Board of Metropolitan Police Commisssioners of the City of Indianapolis:*

''INDIANAPOLIS, IND., April 21, 1887.

''The undersigned respectfully request your board to confer special police powers on John M. Kiley, who is. employed and paid by the undersigned, the said police

powers to be used in and about Park Theater and Dime
Museum, Indianapolis, Indiana.

"And, in consideration of said grant of police powers,
the undersigned hereby become responsible for his obey-
ing your rules, and for all illegal acts done by said John
M. Kiley while doing duty as said special policeman.

"DICKSON & TALBOTT.

"J.

"Approved, N. R. RUCKLE,

Pres't Bd. M. P. Comm'rs."

The complaint was in seven paragraphs, alleging three
causes of action against appellants—assault and battery,
false imprisonment, and malicious prosecution. The
court refused to admit evidence as to the charges of false
imprisonment and malicious prosecution, and instructed
the jury to find for the appellants on those issues. The
court also instructed the jury that the appellants were
not liable for the alleged assault and battery by Gordon,
the ticket seller. Whether there was error in such rul-
ing and instructions in favor of appellants we need not
inquire, since appellee has not insisted on it.

The jury found a general verdict for appellee as to the
assault and battery, and for appellants as to the other
two charges.

The jury also found, in answer to special interrogato-
ries, That John M. Kiley, while in appellants' theater,
on October 1, 1887, struck appellee a number of blows
upon the head with a mace, and thereby inflicted severe
wounds.

That such blows resulted in appellee's losing the hear-
ing of his left ear, and otherwise permanently disabling
him, and causing him to lose his situation as freight
conductor.

That appellee, at the time and place mentioned, in the
view of John M. Kiley, did not commit any crime, or

violate any ordinance of the city of Indianapolis, and that the said Kiley had no warrant for the arrest of appellee.

That John M. Kiley, at the time alleged, was an employe of appellants; that he said nothing to appellee before assaulting him; that it was one of the duties of Kiley, as the servant and employe of appellants, to preserve order and suppress disturbances in appellant's theater, and that he had received from appellants general authority for that purpose.

That appellee, while in appellants' theater on said occasion, had not committed any crime, nor violated any ordinance of said city.

That the said Kiley, at said place and time, assaulted and beat appellee on the head with his mace before he arrested him; that the said Kiley, when so assaulting appellee, was acting as the servant and employe of appellants, and engaged in their business, and acting within the general scope of the duties of his said employment.

That John T. Dickson, brother of one of the appellants, was at said time present in the box office of said theater, and did on said occasion, and prior thereto, sell tickets for appellants; that with the knowledge of appellants, at and prior to said time, the said John T. Dickson went to said theater and gave instructions to appellants' employes; and that in the absence of appellants, the said John T. Dickson was deputized to act for them at their said theater as manager; that he signed the firm name to the application for police powers to be conferred upon the said John M. Kiley, and that he had authority to so sign said firm name; that appellants were at said time the lessees and managers of said theater; that all the injuries received by appellee in and about said theater, on said evening, were inflicted by said John M. Kiley; that said Joseph Gordon was an employe of appel-

lants as one of the ticket sellers on said evening, and was then and there on duty; that said John M. Kiley was an employe of appellants as janitor, and as ticket taker at the west entrance door of said theater on said evening; that he was commissioned as special policeman about April 22, 1887, to act in connection with his other duties at appellants' said theater, and at their special request; that at the request of said Gordon, said Kiley did arrest said appellee on said evening; that all the wounds and bruises received by appellee at said theater, on said evening, were inflicted by said Kiley, near said ticket office, and before the arrest of appellee; that neither of appellants was present at the time appellee received his injuries, and neither of them had directed or advised any assault upon appellee.

It is enough to say that these answers are fully sustained by the evidence in the record.

The main question in this case, and, perhaps, the only one that need be decided, is whether appellants are liable to appellee for the injuries inflicted upon him by their employe John M. Kiley.

The treatment due from a carrier to his passenger, from an innkeeper to his guest, and from a theatrical manager to his patron, while perhaps differing in degree, is similar in kind.

The duty of a railroad company to its passengers is well expressed in *Indianapolis Union R. W. Co. v. Cooper*, 6 Ind. App. 202, 33 N. E. Rep. 219. This was a case where a passenger, having purchased his ticket, was in the company's station on his way to his train, when he was assaulted by one of the "gatemen"; and it was contended, by the company, that the gateman, in making the assault, was not acting in the scope of his employment. The court said: "It seems to us reasonably clear   *   *   *   that the servant was, at the time

Dickson *et al. v.* Waldron.

of doing the acts complained of, on duty for his master, and at or near his proper place, and that the assault was committed on appellee while he was properly on the master's grounds, and under the charge of the master's servants, and entitled to their protection rather than their abuse. * * * Moreover, the appellee did not bear the relation of a stranger to the appellant, but, on the contrary, it owed to him an affirmative duty to protect him from the violence and insults of its own servants at the station. It is well settled that one who has purchased his ticket, and is passing at the proper time from the depot to the train, is a passenger, and entitled to the rights of a passenger. * * * One of the prime duties resting upon a railroad company is to protect its passengers from assaults and injuries by its servants, nor does the question of its liability for a breach of this duty depend upon whether or not the servant, in the performance of the act, is within the scope of his employment."

In *Lake Shore, etc., R. W. Co.* v. *Prentice* ( U. S. Sup. Ct.), 13 Sup. Ct. Reporter, 261, it is said: "A corporation is doubtless liable, like an individual, to make compensation for any tort committed by an agent in the course of his employment, although the act is done wantonly and recklessly, or against the express orders of the principal." See, also, *Citizens' Street R. W. Co.* v. *Willoeby, by Next Friend,* 134 Ind. 563.

In *Chicago, etc., R. W. Co.* v. *Bayfield,* 37 Mich. 205, Cooley, C. J., speaking for the court, says: "It is, in general, no excuse to the employer that an injury which has occurred was caused by disobedience of his orders, whether they be express orders or implied orders. He assumes the risks of such disobedience when he puts the servant into his business; and the reasons for holding him responsible for the servant's conduct are the same, whether the injury results from a failure to observe the

master's directions, or from neglect of the ordinary precautions for which no specific directions are deemed necessary. It will be conceded that for a positive wrong beyond the scope of the master's business, intentionally or recklessly done, the master can not be held responsible; this being very properly regarded as the personal trespass or tort of the servant himself. But when the wrong arises merely from an excess of authority, committed in furthering the master's interests, and the master receives the benefit of the act, if any, it is neither reasonable nor just that the liability should depend upon any question of the exact limits of the servant's authority. The master fixes these, and it is his duty to keep his servant, in what is done by him, within the limits fixed. An act in excess would still have the apparent sanction of his authority; the occasion for it would be furnished by the employment, and the injured party could not always be expected to know or be able to discover whether it was or was not without express sanction.''

In *Higgins* v. *Watervliet Turnpike & R.R.Co.*,46 N.Y.23, the following is quoted with approval from an English case:   ''It is said, that though it can not be denied, that the defendant authorized his guard to superintend the conduct of the omnibuses generally, and that such authority must be taken, to include an authority to remove any passenger who misconducts himself, yet the defendant gave no authority to turn out an inoffensive passenger, and the plaintiff was one. But the master, by giving the guard authority to remove an offensive passenger, necessarily gave him authority to determine whether any passenger had misconducted himself. It is not convenient for the master personally to conduct the omnibuses, and he puts his guard in his place, therefore, if the guard forms a wrong judgment the master is responsible.''

Dickson *et al. v.* Waldron.

In *Drew* v. *Peer*, 93 Pa. St. 234, which was a case where Peer and his wife had purchased tickets and entered a theater, and were ejected with force by the attaches of the theater, because of their being colored persons, the following were approved as correct instructions to the jury: "If the ticket agent had called upon any one in the crowd 'to put that nigger out,' and some ruffian had done so, the defendant would be liable.  *   *  * If the injury was committed by an agent out of the usual course of employment, the defendant was not responsible; but if the injury was committed by the defendant's doorkeeper or ticket-taker, then it was in the course of their employment."

In the case at bar it was the ticket agent, Joseph Gordon, who called out to have appellee arrested, and it was not a ruffian bystander who put him out, but it was appellant's doorkeeper, acting in the course of his employment. In this case, also, the evidence shows, and the jury so found, that appellee was without fault.

The trouble was occasioned entirely by a dispute as to the purchase of tickets, and both the ticket-seller and the doorkeeper acted within the business of their employment, maintaining that side of the controversy, which was in their master's interest.

In *Higgins* v. *Watervliet Turnpike Co., supra,* it was claimed that no authority had been given to turn out an inoffensive passenger, and that, therefore, there was no liability for the servant's acts; but the court held that the authority to remove an offensive passenger necessarily carried authority to determine whether any passenger was offensive or not. So here, the matter was about the master's business, and the servant of necessity must be the judge as to whether the conduct of appellee was such as to require his removal; and if a mistake was

Dickson *et al. v.* Waldron.

made, and an inoffensive patron of the theater was unjustly attacked and injured, the master must respond.

"It is not convenient for the master personally to conduct the [business of keeping order in his theater], and he puts his guard in his place; therefore, if the guard forms a wrong judgment the master is responsible." See, also, *Groff* v. *Great Northern Co.*, 3 Ellis and Ellis, 673.

But this case is even stronger; not only was the master here represented by his ticket agent and his janitor, or doorkeeper, but his special agent, John Dickson, "deputized to act in his absence," was present in the theater ticket office and looking out through the window upon the whole transaction. He testifies that he said and did nothing in the premises, and his silence can be taken only as his and appellants' approval of what was done.

Indeed, no rule is better established than that a principal is responsible for the acts of his agent performed within the line of his duty, whether the particular act was or was not directly authorized, and whether it was or was not lawful. *Evansville, etc., R. R. Co.* v. *McKee*, 99 Ind. 519; *Pennsylvania Co.* v. *Weddle*, 100 Ind. 138; *American Express Co.* v. *Patterson*, 73 Ind. 430; *Lake Shore, etc., R. W. Co.* v. *Foster*, 104 Ind. 293.

But common carriers, inn-keepers, merchants, managers of theaters, and others, who invite the public to become their patrons and guests, and thus submit personal safety and comfort to their keeping, owe a more special duty to those who may accept such invitation. Such patrons and guests have a right to ask that they shall be protected from injury while present on such invitation, and particularly that they shall not suffer wrong from the agents and servants of those who have invited them.

*Chicago, etc., R. R. Co.* v. *Flexman,* 103 Ill. 546; *Craker* v. *Chicago, etc., R. W. Co.,* 36 Wis. 657.

But it is said that John M. Kiley was a policeman, and therefore appellants are not responsible for his attack upon appellee. Whether, at the time of the injuries complained of, Kiley was acting as a policeman or as agent of appellants must depend upon the acts done by him. Because he was a police officer, it does not follow that all his acts were those of a policeman; and because he was an agent of appellants, it does not follow that all his acts were those of such agent. Even if he were a regular patrolman, called in off the street by appellants or their agents to aid in enforcing the regulations of the theater, he would, for such purpose, be only an agent of appellants, and for his conduct as such agent, within the scope of his employment, appellants would be responsible. If, however, after entering the theater he should discover appellee in the act of violating a criminal law of the State or a penal ordinance of the city, and should proceed to arrest him for it, such act of arrest would be that of a police officer. And if such arrest were made on the officer's own motion, without direction, express or implied, on the part of appellants, then appellants would not be responsible. *Jardine* v. *Cornell,* 50 N. J. Law, 485, 14 Atl. Rep. 590.

In this case, however, such questions do not arise. The court expressly withdrew from the consideration of the jury the issues made under the allegations of false imprisonment and malicious prosecution, and directed a verdict for appellants on these issues. Nor was any evidence admitted on these issues. Besides, the evidence given by both appellants and appellee showed unquestionably that all the injuries received by appellee were inflicted upon him before he was arrested; and it is still

further established that appellee had done no act for which he should be arrested, and the jury so find.

Kiley's acts as a policeman were committed after he had assaulted and beaten appellee. It could not be seriously contended that Kiley could do no wrong as a janitor and doorkeeper, but that every wrong done by him should be charged to his official character. This would enable a proprietor to have all his employes commissioned as police officers, and thus escape all liabilities for their misconduct to his patrons.

It is a question whether appellants should not be held liable for all the acts of Kiley, whether as special policeman, acting only for his employers, or as janitor or doorkeeper, all being within the scope of the business of his employment; but, as we have seen, such question is not before us. The verdict of the jury is in favor of the appellee on the charge of assault and battery; and the evidence, as well as the findings of the jury, show that all assault and battery committed upon appellee was committed before Kiley exercised any of his powers as a police officer, and before he made the arrest of appellee.

If appellee had attempted to resist arrest, or if he had attempted to get away after arrest, and he had received his injuries in consequence of such attempts, or if he had even committed any crime for which he should be arrested, there might be some reason in appellants' contention on this point. But, on the contrary, it is clear that appellee was innocent of any wrongdoing for which he should be arrested; he never even struck back at either of his assailants. He neither resisted arrest nor tried to get away when arrested. The only words uttered by him were rather a request to be arrested, and so avoid further danger to his person. "I asked him what he was beating me for, and I said if he had anything to ar-

rest me for, to arrest me, and, for God's sake, not to beat my brains out.''

The cases of *Mali* v. *Lord*, 39 N. Y. 381, and *Hershey* v. *O'Neill*, 36 Fed. Rep. 168, are cases relied upon by appellants. In the first of these cases it seems to be held by the court that a clerk or superintendent of a store has not, by virtue of such employment, authority ''to arrest, detain, and search any one suspected of having stolen and secreted about his person any of the goods kept in such store.''

We think this can not be the law. It is not in harmony with the weight of authority, nor with sound reason. If a superintendent or clerk of a store has such suspicions aroused in his mind, by the actions of some visitor at the store, but two courses remain for him, either to let the supposed thief go free, or to search him. The first course can not be taken without unfaithfulness to the interests of the employer. The employer must, therefore, be held to sustain his superintendent in taking the second course, and, if a mistake is made, the employer must certainly be liable. He has selected his clerk, and must rely upon his judgment to act for his interests in his store. The clerk, in securing the stolen property, is not acting for himself, but for his employer.

In the case of *Hershey* v. *O'Neill, supra*, the court seems to place its decision chiefly, not on the grounds assumed by appellants, but on the grounds that the plaintiff had, in fact, been guilty of an attempt to steal the goods, and that, consequently, a just verdict had been rendered, which ought not to be disturbed.

The other alleged errors discussed by counsel for appellants show no sufficient reason for disturbing the judgment rendered. The complaint was sufficient, under the statute. There was no available error in the rulings of the court on the evidence. The instructions

to the jury were all that appellants were entitled to ask, and were more favorable to appellants than to appellee. There was a verbal error in one of the answers of the jury to an interrogatory, but it was harmless to appellants; the interrogatory was fully answered by the answer to the preceding interrogatory. The verdict and the answers to interrogatories are fully sustained by the evidence, and we find no available error in the record.

The judgment is affirmed.

Filed June 7, 1893.

### ON PETITION FOR A REHEARING.

HOWARD, J.—Owing to the importance of this case, we have given particular consideration to the petition for a rehearing, and to the reasons therefor advanced by counsel, but find no cause to change our opinion on the merits of the case.

Because the complaint alleged that appellee's mind had been impaired by reason of his injuries, and because evidence in support of this allegation had been received, it is urged that the court erred in allowing appellee to be called, and to testify as a witness. Whether, at the time of the trial, the appellee, or any other person offered as a witness, was in fact competent to testify, was a question that must be decided by the court then and there. The witness was before the court and jury, and whether he had been injured in body or in mind on the occasion of the assault, it does not follow that at the trial he was incompetent to testify; that was a question for the court to determine, and we do not find that any abuse of discretion was shown. It was for the jury to give such credit to the testimony offered as it was entitled to receive.

Counsel also argue that because Kiley was appointed special policeman by the Board of Metropolitan Police

Commissioners, under the statute of the State, therefore this case is widely different from the cases cited in support of the opinion, in which police powers are conferred by law upon a particular class of persons in a particular line of employment, as, for instance, conductors on railway trains. Counsel say that such persons are not appointed by any public official, and that their choice and selection, their employment and discharge, are entirely within the power and control of the persons who are their superiors, and who are engaged in carrying on the business with which such appointees are connected. And counsel conclude that the reason for the difference between such appointees and special police officers is founded upon the principle that the person who selects another to act for him, is bound to select one who will do no wrong.

When police powers are conferred by law upon a particular class of persons, in a particular line of employment, it is difficult to see why a different rule should apply from that which obtains when such powers are conferred by a public official who himself derives his authority also from the law. In the one case, the law confers the powers directly; in the other, the powers are conferred by an official authorized by the law itself to do so. In both cases the selection is made by the person for whom the officer is to act; as, in this case, Kiley was selected by the appellants, and they expressly bound themselves that they would be responsible for his acts, in other words, that he would do no wrong.

Kiley, by this appointment, was not "made appellants' agent without their consent," but was appointed police officer for their house at their special instance and request, as the record shows. He received his pay from, and was employed solely by, appellants, and they might discharge him at any time.

But, besides this, the jury found that the wrong done by Kiley was not done in his capacity as policeman, but that, "When he assaulted and beat the plaintiff, he was acting as the servant and employe of the defendants, and engaged in the defendants' business, and within the general scope of the duties of his employment by the said defendants." And these findings are supported by the evidence.

The petition for a rehearing is overruled.

