KUSNIR v. PRESSED STEEL CAR CO.

(District Court, S. D. New York. December 31, 1912.)

1. MASTER AND SERVANT (§ 301*)—EMPLOYMENT OF POLICE OFFICER—MISCONDUCT—MASTER'S LIABILITY.

Where defendant, with the consent of the state, employed a police officer to preserve order and protect and preserve its property in and about its plant, and the officer, while engaged in the performance of his duties, shot and injured another employé without justification, the fact that he was such officer did not relieve defendant from liability for his act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1210–1216; Dec. Dig. § 301.*]

2. STATES (§ 112*)—POLICE OFFICER—WILLFUL ACTS—LIABILITY.

The state is not liable for the willful act of a police officer in shooting an employé of a private manufacturing corporation, while the officer was also acting as an employé of such corporation to preserve order in its plant and protect its property.

[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

3. MASTER AND SERVANT (§ 327*)—INJURIES TO SERVANT—RIGHT ON MASTER'S PROPERTY.

Where plaintiff and others employed in defendant's manufacturing plant had been ordered to return to their homes on the morning of plaintiff's injury, in order to prevent a threatened strike in the works, plaintiff was entitled to a reasonable time to leave the plant, and while doing so within such reasonable time was not a trespasser.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1266; Dec. Dig. § 327.*]

4. MASTER AND SERVANT (§ 330*) — INJURIES CAUSED BY POLICE OFFICER — EFFECT OF EVIDENCE.

Plaintiff a workman in defendant's plant, while leaving it was shot by a police officer doing private duty inside the plant. In an action for injuries so sustained, plaintiff claimed that he was shot while on his hands and knees under a rail table, and that the ball entered the outside of his arm and passed downward, part of it emerging just above the elbow. Defendant claimed that plaintiff was shot while clasping the officer from behind, facing his back, with both arms around him, and that the ball entered on the inside of the arm, passed upward toward the shoulder, and emerged on the outside. Held that, if the evidence showed that the bullet entered on the outside of the arm above the elbow and passed downward, emerging on the inside, that fact was corroborative of plaintiff's testimony and theory of the case.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1270–1272; Dec. Dig. § 330.*]

5. JUDGMENT (§ 559*)—RES JUDICATA—CONVICTION ON CRIMINAL CHARGE.

Plaintiff, an employé in defendant's plant, was shot and injured while leaving the plant by a police officer, employed by defendant to preserve order therein. Immediately thereafter the officer swore out a warrant

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

against plaintiff for felonious assault, on which he was tried, found guilty, and sentenced to pay a fine and to be imprisoned for three years. He was paroled, however, and never imprisoned, and at the trial defendant company was represented by its private counsel and took part in the prosecution. *Held*, that such conviction was not res judicata in a subsequent action by plaintiff against defendant for alleged injuries resulting from the willful misconduct of the police officer in shooting him.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1077, 1078; Dec. Dig. § 559.*]

6. DAMAGES (§ 132*)—EXCESSIVENESS—INJURIES TO SERVANT.

Plaintiff, an employé of defendant, 32 years of age, and earning from $15 to $17.50 a week, was shot in the arm by a private police officer, employed by defendant to keep order in its plant. The bullet entered the arm above the elbow, and, having broken the bone, was shattered into fragments, which were driven downward toward the elbow, where they were imbedded in the flesh and muscles. Only a part of the bullet emerged from the arm. The bone did not unite, and was thereafter wired together. The wound did not heal, and continued to discharge, there being dead bone still in the arm, thus leaving plaintiff's arm useless for labor. There was a difference of opinion as to improvement and recovery. *Held*, that a verdict awarding plaintiff $8,500 was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

At Law. Action by Steve Kusnir against the Pressed Steel Car Company. Verdict for plaintiff for $8,500 damages, and defendant moves to set aside the verdict as against the evidence, and as excessive, and for a new trial on the minutes. Denied.

Rufus M. Overlander, of New York City (H. Snowden Marshall, of New York City of counsel), for plaintiff.

Joline, Larkin & Rathbone, of New York City (Lewis H. Freedman and Harold Russell Griffith, both of New York City, of counsel), for defendant.

RAY, District Judge. The plaintiff at the time of the transaction complained of, about April 18, 1910, was a common laborer in the employ of the defendant corporation at its manufacturing plant in the state of Pennsylvania. He has and had a wife and three children. He is now doing odd jobs, such as his physical condition will permit. He was then working at piece work as a riveter of cars, and earned from $30 to $35 each two weeks. On the trial, October 28, 1912, it was evident that he was not able to do a full day's work of hard manual labor by reason of the condition of his arm, which had been broken and, to an extent, shattered above the elbow by a pistol ball fired by one Charles P. Smith, known in the record also as Captain Smith, who at the time of the transaction in question was in the employ of the defendant company as an armed watchman, and was also a police officer of the state, commissioned by the government of said state of Pennsylvania.

The defendant was and is a corporation of the state of Pennsylvania, engaged in manufacturing pressed steel cars, and had an extensive plant and employed hundreds of men. There was evidence

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

tending to show, and which justified a finding, that April 18, 1910, one of the men in defendant's employment had been discharged; that there was disaffection in the department to which he belonged; and in which Kusnir was employed; that there had been some talk of a strike, and that defendant had some reason to apprehend one, and had determined to send the men home that morning without letting them go to work as the best means of averting trouble. In anticipation of some possible disorder, Smith, as an armed watchman in the employ- ment of the defendant, was there at its instance and pursuant to such employment to act in its behalf, if occasion demanded. On the morn- ing of the 18th, the men came to the number of several hundred, Kus- nir being one, and after having taken their tools, but before going to work, were ordered home. They were entitled to a reasonable time in which to depart, and it was, of course, the duty of these men to depart in a quiet and an orderly manner, doing no violence. Smith, as stated, was there armed at the instance of the defendant, and as its employé and servant, to aid, if necessary, in keeping order and in pro- tecting the property of the defendant. As a duly commissioned police officer of the state he unquestionably had the right, and it was his duty, if he saw a crime being committed, even there to apprehend the offender, even without process. On these questions the court charged the jury, and no exception was taken and there was no request to charge differently, as follows:

"Smith, the officer who did the shooting, and he admits that he did the shooting, was commissioned by the state of Pennsylvania, or its Governor, as an officer of the peace, and, of course, had the right, in the exercise of the police power of that state and the administering of the criminal laws and enforcing them, to arrest any one engaged in the commission of a crime in his presence. He was a peace officer at this time, and held his commission; but he was employed at this particular time by the defendant company, and represented it in the keeping of order and the protection and preserving of its property against unlawful acts, and riotous conduct, if any there should be, in its shops and on its premises, and was employed to keep order and preserve the peace, and was kept there at this particular time, and had been for some little time before, by the defendant company. Smith occupied a sort of a dual position, in this: As a peace officer, commissioned by the Governor of the state, of course, if he saw an offense being committed, a violation of the criminal law, he had the right as such officer, even without a warrant, to make an arrest to preserve the peace, and see that the law was properly enforced in that regard by arresting the offender. That right he had by virtue of the commission, irrespective of whether he was engaged by the defendant or not—irrespective of whether or not he was in the employ of the defendant company to preserve the peace against riotous conduct, un- lawful acts, even on its property, and protect and preserve its property. For all such acts of Smith defendant is not liable. But he was employed there by the defendant company to protect its property, and therefore, at the time in question, was, admittedly, the alter ego of the company; that is, he repre- sented in that respect, for that purpose, the company. Of course, the com- pany itself had the right to protect its property against riotous conduct, and to have men there on its property to preserve the peace, and it was the duty of the men in the employ of the company, when they were not at work, under reasonable rules and regulations, to leave the premises of the defendant com- pany in a quiet, peaceable, and orderly manner. Of course, they had a rea- sonable time to come and a reasonable time to go under ordinary circum- stances."

Kusnir, the plaintiff, claimed, and gave evidence tending to show, and which justified the jury in finding, that he was departing in a quiet and a peaceable manner, doing no harm, creating no disorder, and neither committing nor attempting to commit any offense, or violate any law, or any rule or regulation, when he saw Smith in his path, armed and engaged in an altercation with a big Russian; that he was afraid, and to avoid danger and injury dodged under a table of steel rails or beams; that the Russian escaped Smith, who excitedly and negligently mistook Kusnir for the escaping Russian, and pursued him, and, as he endeavored to get from under the beams and go away, that Smith carelessly and negligently and wrongfully, seeking to keep order pursuant to his employment by defendant, first struck plaintiff on the head, and then, he not coming out, reached down and with his revolver or pistol willfully, negligently, and unnecessarily shot plaintiff through the arm as he was on his hands and knees, doing no harm and committing no violence. The plaintiff claimed, and gave evidence tending to show, and which justified the jury in finding, that the ball entered the arm on the outer part of the same some distance above the elbow, and, having broken the bone, was shattered into fragments, which were driven downward towards the elbow, where they are now imbedded in the flesh and muscles, and that only a small part of the bullet passed out. The bone, not having united, was at a later time wired together, and the wound has never healed, and still discharges, and there is still dead bone in the arm.

The contention of the defendant was and is that, as the men were going out, there was much disorder and many threats, and that Kusnir attacked Smith with a heavy piece of iron, and then dodged under the table of rails or beams, and later came out and seized Smith about the body with both arms from behind, pinioning him to a degree, and was endeavoring to gain possession of Smith's revolver, when he (Smith) as missiles were being thrown by others which endangered him, got out his revolver and, placing the muzzle against the inside of Kusnir's arm just above the elbow, fired, not intending to kill, and that the bullet entered on the inside, broke the bone, and passed upwardly and out on the outer side of the arm and higher up; that is, at the place where Kusnir and his witnesses say it entered. It was contended on the trial that if Kusnir was on Smith's back, and facing his back, with both arms around Smith's body, that it was well-nigh impossible and highly improbable that Smith reached far back and above Kusnir's elbow and pointed his revolver towards his own body (Smith's) before firing, as must have been the case if the parties occupied the position described by Smith and some of his witnesses, and the ball in fact entered on the outside of the arm and quite a distance above the elbow, and then passed down towards the elbow. There was not only this conflict of evidence as to the position of Smith and Kusnir when the shot was fired, but a conflict of medical evidence as to the place of entry of the ball, its course, and point of egress.

Kusnir was taken to the hospital the same day, and while there and on the same day Smith swore out a warrant against him for felonious assault. He was not tried until the following October, when he was

found guilty and sentenced to pay a fine of $500 and to be imprisoned for three years. He was paroled, however, and not imprisoned. On the trial, if not before, the defendant here, Pressed Steel Company, was represented by its private counsel, who took part in the prosecution. The plaintiff claims he employed no counsel. Smith is a large, heavy man, and Kusnir is a slight, small man. Smith was armed; Kusnir was unarmed. On this trial the defendant called several witnesses, who claimed to have seen what occurred at the time Kusnir was shot. Their evidence was conflicting, and contradictory of each other and of Smith, in some important respects. The evidence presented a square question of fact as to what occurred April 18, 1910, and as to the motives and influences which impelled Smith, this employé of the defendant, to charge Kusnir with a deadly assault with intent to murder, and the defendant here to employ its private counsel in the prosecution of Kusnir. If the contention of Kusnir was correct as to what happened April 18, 1910, and the jury found it was, then the assault on him by Smith was not excusable or justifiable, but a grossly careless and reckless act, for which the defendant was responsible, and the shooting was willful and unnecessary.

Was or was not that criminal prosecution for the purpose of putting Kusnir in the wrong and discrediting him? It was for the jury to say. The only employé of the defendant who testified on that trial in behalf or favor of Kusnir was at once discharged by the defendant. The only purpose the defendant claimed for putting the record of that proceeding in evidence was to discredit Kusnir on this trial, but later excepted to the charge of the court that the verdict of the jury in the criminal case in Pennsylvania was not res adjudicata in this case. The defendant here now claims that there was no evidence that Smith, in assaulting and shooting Kusnir, was acting within the general scope of his employment for the defendant company, and that the fact that he was at the time a police officer of the state of Pennsylvania, duly commissioned by the Governor of that state, exonerates the defendant here from liability.

[1] Where private parties, even with the consent of the state, employ its police officers to represent them, and do special work for them in protecting and preserving their property and maintaining order on their premises, and such officers are engaged in the performance of their duties to their employers, and are acting within the scope of their powers and duties, they become and are the servants and employés of such private parties and their representatives, and for grossly negligent acts, wantonly, willfully, and unnecessarily committed by them in the line of their duty, and when engaged in the performance of such duties, to the injury of others, the master or employer is liable. Employers cannot escape responsibility for the grossly negligent, wanton, and willful acts of persons employed by them, and representing them, and paid by them, by employing constables, marshals, sheriffs, and peace officers of the state, provided such grossly negligent, willful, wanton, and wrongful acts are done by such representatives where and while acting within the general scope of the authority conferred on them. To establish a rule to the contrary would lead

to the grossest acts of infamy and outrage, and destroy, as it ought, respect for government and courts.

[2] The state would not be liable for such acts, and if the employer —that is, the master, who makes the officer his representative for his private purposes—is not, because the wrongdoer is a police officer, such officer may perform the work he is employed to do in the most grossly careless, wanton, and willful manner, fraught with great peril to others, and the injured party must look to the wrongdoer, usually of no pecuniary responsibility, and not the employer, who employed the wrongdoer to do the very acts complained of, but not in a wanton, willful, and negligent manner, a mode fraught with peril to others. Of course, the employé must be acting in the line of his duty to his master, and within the general scope of his authority, and represent him in that matter. The proposition is squarely decided by the Court of Appeals of the state of New York in Sharp v. Erie R. R. Co., 184 N. Y. 100, 105, 76 N. E. 923, 6 Ann. Cas. 250, and in Parke v. Fellman and Interborough Rapid Transit Co., 145 App. Div. 836, 838, 130 N. Y. Supp. 361, by the Appellate Division of the Supreme Court. Magar v. Hammond, 183 N. Y. 387, 76 N. E. 474, 3 L. R. A. (N. S.) 1038, is in effect the same. Pennsylvania R. Co. v. Kelly, 177 Fed. 189, 101 C. C. A. 359, 30 L. R. A. (N. S.) 481 (C. C. A., 2d Circuit), is in no way to the contrary.

In the Kelly Case a special policeman was assigned to duty on defendant's pier (that of the railroad company) and the railroad company paid his wages for keeping order on the premises. It was his duty to regulate traffic on the pier of the railroad company. He was subject to the orders of the chief of police. While under assignment to this particular duty, but not while performing it, and when off the pier and in the public street, this officer engaged in an altercation with the driver of a piano truck, and finally struck him with his club and inflicted severe injury. There was no evidence that the altercation had anything to do with keeping order or regulating traffic on the pier. The injured party sued the railroad company, and it was wisely and properly held that he could not recover. Judge Coxe, in giving the opinion of the court, in which Judges Lacombe and Noyes concurred, said:

"The question, then, for us to determine, may be stated as follows: Is a corporation which pays for the services of a policeman to guard its property and preserve order upon its premises liable for an unprovoked and wholly unjustifiable assault committed by him upon a public street? We are constrained to answer this question in the negative. * * * To hold the person who pays a policeman's wages for keeping order upon his premises liable for such a malicious assault as this, committed upon a public highway, goes far beyond the doctrine of any well-considered case with which we are familiar. If the plaintiff tells the truth, there was no justification for the brutal assault made upon him; but the defendant has done no act of omission or of commission which renders it liable therefor."

If the officer had been on the pier, and engaged in the performance of duties to which assigned by the railroad company and for which it was paying, quite a different proposition would have been presented. The Kelly Case is in line with Tyson v. Bauland Co., 186 N. Y. 397,

403, 79 N. E. 3, 9 L. R. A. (N. S.) 267, where it is held that it must appear the acts were done within the general scope of the employment, and not solely as an officer of the law.

In the Sharp Case, supra, George Sharp, a boy 17 years of age, with one or two others, had stolen a ride on one of defendant's trains. At Salamanca, learning there were detectives in the yard, they jumped from the train and ran, and were pursued by one Wheeler, who was a police officer, but in the employ of and paid by the railroad company, and it was a part of his duty to the company as such employé to drive off and keep off trespassers from the company's property. Sharp, in running away, left the property of the defendant company, and went on the land of others; but Wheeler continued the pursuit, drew a pistol, and fired, and killed the boy. It was contended that Wheeler was acting as an officer having power to arrest a trespasser on the railroad property, which he had, and that, even if, while on the property of the defendant company, he was acting within the general scope of his employment by the company, he ceased to be so acting when he left that property, and was an officer of the law merely, and acting as such at the time he fired the fatal shot. The Court of Appeals held that it was a question of fact for the jury whether Wheeler, after he passed the line of property and fired at the boy, was still acting pursuant to his employment by the railroad company, and within the general scope of his authority, or as an officer of the law. The court also held:

"A railroad company, employing a servant who happens to be a public officer, acquires no immunity from such employment. Constables and policemen are often employed by corporations in the same capacity as Wheeler was. It is not beyond the province of a jury in such a case to find that the official acts of the employé are to be used for the benefit of the defendant and in protection of its interests or property; and hence, in such a case, the character of the servant's act is to be determined in the same way and upon the same principles as if he was not a public officer at all. If he acts maliciously, or in pursuit of some purpose of his own, the defendant is not bound by his conduct; but, if, while acting within the general scope of his employment, he simply disregards his master's orders, or exceeds his powers, the master will be responsible for his conduct."

[3] Kusnir was not a trespasser. He was rightfully where he was, and, as the jury found, doing no wrong. He was on the defendant's property as its employé, and on his way home pursuant to its orders. Smith was there, not as a police officer, but as the employé and representative of defendant, and was, the jury found, at the time engaged in the performance of his duties to the defendant pursuant to such employment and acting within the general scope of his employment. The jury was instructed in plain and unequivocal terms that for all acts done by Smith as a police officer the defendant was not liable, and were repeatedly told that it was for them to determine whether Smith, when he shot Kusnir, was acting within the general scope of his employment and authority from the defendant company, and also that the plaintiff could not recover unless they found that Smith was acting within the general scope of his employment, and in the discharge of his duty to the company pursuant to his employment, when

he shot Kusnir, and it was also left to the jury to determine what Smith's employment and duty to his employer was. The jury was also instructed that Smith had the right to defend himself against an assault by Kusnir, and that if the shot was fired while so defending himself the defendant here was not liable; also that defendant was not liable if Smith was assaulted, and in defending himself—

"made a mistake in his judgment and went a little too far; the law would not hold him or the defendant responsible for a mistake or error of judgment under such circumstances."

Other cases in line with and to the same effect as Sharp v. Erie R. R. Co., 184 N. Y. 100, 76 N. E. 923, 6 Ann. Cas. 250, are Ill. Steel Co. v. Novak, 84 Ill. App. 641, affirmed 184 Ill. 501, 56 N. E. 966, Brill v. Eddy, 115 Mo. 596, 22 S. W. 488, King v. Ill. Cent. R. R. Co., 69 Miss. 245, 10 South. 42, Dickson v. Waldron, 135 Ind. 524, 34 N. E. 506, 35 N. E. 1, 24 L. R. A. 483, 488, 41 Am. St. Rep. 440, and St. L., etc., Ry. Co. v. Hackett, 58 Ark. 381, 24 S. W. 881, 41 Am. St. Rep. 105.

[4] It is urged that it was error for the court in charging the jury to say that if they found that the bullet entered on the outside of the arm above the elbow, and passed downwardly towards the elbow and emerged on the inside, such fact was a corroboration of the plaintiff's testimony and theory of the case. As the defendant all through the trial had contended and argued, and given evidence to the effect, that the ball entered on the inside of the arm and passed rather upwardly towards the shoulder and emerged on the outside of the arm, and that therefore Kusnir's claim as to the position of the parties when the shot was fired could not be true, and that Smith's claim was, I see little force in this contention. All through the trial both parties placed stress on the point of ingress, the course, and point of egress of the ball as bearing on the position of the parties when the shot was fired. It was a crucial point in the case whether Kusnir was on his hands and knees on the floor, with Smith on the table above pointing down, when shot by Smith, or on the back of Smith, facing his back, with both arms clasped around him, when the shot was fired.

It is evident, I think, to the ordinary mind, that while Smith might have reached, still it is not probable that he did reach, far back as Kusnir was on his back, turn his revolver, and shoot towards his own person, and he denied that he did. If Kusnir was on his hands and knees, it is equally improbable that Smith reached down and pointed his revolver up in his own direction, and then fired, endangering himself. In any event, the position of parties was very material, as bearing on the truth of the story told by each, and the point of entry, course, and point of egress of the bullet was important on this issue. Smith claimed he pointed his pistol backward, and fired backward into one of the arms of plaintiff clasped about his (Smith's) body from behind. If so, the ball could not have *entered* on the outer side of the arm at the point shown, but could have emerged there. On the other hand, if Kusnir was on his hands and knees, and Smith reached down and fired when over Kusnir, it is very probable the ball would have

entered at the place Kusnir and his medical experts say it did. If A. is shot by B., and the defense urged is self-defense, and A. says he was shot at and wounded by B. while his (A.'s) back was towards B., and B. says he fired when A. was facing him, and it is proved that the ball entered the back of A. and emerged in front, it seems to me clear that this fact is competent proof in corroboration of the story of A. as to the shooting and the position of the parties when the weapon was discharged.

[5] As to the defense of res adjudicata by virtue of the criminal prosecution. If A. sues B. for assault and battery, but B. was beforehand, and swore out a warrant for A., and obtained a verdict in the criminal case, in which the people or the government was complainant, that A. assaulted B. in that transaction, and a judgment is pronounced accordingly, is this res adjudicata between A. and B. in the civil case for assault and battery? The parties are not the same, and B. could not change the rule by employing counsel to prosecute the criminal case. Again, there is no privity, and the purpose of the proceedings are different. But the rule is settled that:

"A judgment in a criminal prosecution constitutes no bar or estoppel in a civil action based upon the same acts or transactions, and conversely of a judgment in a civil action sought to be given in evidence in a criminal prosecution." 24 Cyc. 831, title "Res Judicata," and the numerous cases there cited, both English and American; 1 Greenl. on Ev. § 587; 2 Wharton's Law of Ev. § 776; Wilson v. Manhattan Ry. Co., 2 Misc. Rep. 127, 20 N. Y. Supp. 852, affirmed 144 N. Y. 632, 39 N. E. 495; Johnson v. Girdwood, 7 Misc. Rep. 651, 28 N. Y. Supp. 151, affirmed 143 N. Y. 660, 39 N. E. 21; Betts v. New Hartford, 25 Conn. 180; State v. Bradnack, 69 Conn. 212, 37 Atl. 492, 43 L. R. A. 620.

[6] It is clear on the record that the verdict was not contrary to the weight of evidence, or unsupported thereby. The jury saw and heard the witnesses, and judged of their fairness and honesty. They saw and heard Kusnir and Smith. There were no appeals to passion or prejudice. The amount of the verdict is large, but I do not think it excessive. At the time of the transaction in question Kusnir was 32 years of age. He had worked for the defendant company several years. He was earning from $15 to $17.50 per week, or at least $780 per year. It was a self-evident fact on the trial that the arm was then useless for labor. There was a difference of opinion as to improvement and recovery. It was for the jury to determine the extent and probable duration of the disability. Courts should be slow to interfere with the verdicts of juries in these matters, and in attempting to regulate them to suit their own notions. It is presumed the plaintiff will earn something, but how much is speculative and conjectural. If not disabled, he would have earned $1,500 or over in the two years preceding the trial, and considering his probable duration of life, and the reasonably probable continuation and extent of his disability, and his earning capacity before and since the shooting, I think the verdict not excessive, at least to an extent that will justify the court in interfering with the verdict.

Motion denied.