(107 App. Div. 433.)

## SAMUEL v. WANAMAKER et al.

(Supreme Court, Appellate Division, First Department. September 29, 1905.)

FALSE IMPRISONMENT—SPECIAL OFFICERS—LIABILITY OF EMPLOYER FOR ARREST.
     Defendants, at whose request one was designated as a special officer at
     their store under New York City Charter, Laws 1897, p. 109, c. 378, § 308,
     providing that the public board may on application of any persons ap-
     point a special patrolman to do special duty at any place in the city, on
     the persons applying therefor paying for his services, he to be subject to
     the orders of the chief of police, and to possess all the powers and dis-
     charge all the duties of the police force applicable to regular patrolmen,
     are not liable for an arrest made by him, in the absence of anything to
     show that they ever authorized him to make an arrest, or that in doing
     so he was acting otherwise than in the exercise of the powers conferred
     on him by his appointment.
     O'Brien, P. J., and Patterson, J., dissenting.

Appeal from Trial Term, New York County.

Action by Sophie Samuel against John Wanamaker and others.
From a judgment on a verdict for plaintiff, and from an order denying
a new trial, defendants appeal. Reversed.

Argued before O'BRIEN, P. J., and HATCH, McLAUGHLIN,
PATTERSON, and INGRAHAM, JJ.

Louis Frankel, for appellants.
Arthur Furber, for respondent.

INGRAHAM, J. In this case the plaintiff alleges two causes of
action. The first is based upon an alleged assault on the plaintiff by the
defendant, through one of their duly authorized agents, on a public
street in the city of New York, where she was unlawfully forced and
dragged and compelled to go to the store of the defendant, and where
she was imprisoned and placed in close confinement and restrained of
her liberty, and was treated with insult, brutality, contempt, and in-
dignity to her person by the duly authorized agent and servants of the
defendants, who charged the plaintiff with being a thief, and called her
vile names, for which the plaintiff asks damages for $20,000; and for a
separate cause of action these acts are realleged, and that in conse-
quence thereof she was greatly hurt, bruised, and wounded in body,
and her nervous system greatly shocked, and she became sick and sore,
and so continues to the present time, during all of which time the plain-
tiff suffered and still suffers much pain and anguish of mind, and was
made very nervous, which she asks damage in the sum of $5,000.

Upon a trial, after a jury had been impaneled, counsel for the de-
fendant asked the court to direct the plaintiff to elect as to whether the
action was for false imprisonment or malicious prosecution, whereupon
counsel for the plaintiff stated: "We elect false imprisonment." At-
tention was then called to the second cause of action, when the court
said: "Then the second cause of action fails." And counsel for the
defendant said: "I assume that the prayer for relief is $20,000 on the
false imprisonment." When counsel for the plaintiff said: "We will
let it go at that." Thereupon counsel for the defendant moved to strike
out certain allegations of the complaint, which motion was granted. A

like motion was made as to certain other allegations of the complaint, which motion was denied, and the trial then proceeded.

From the evidence it appeared that the defendants conducted a large retail store in the city of New York, and that one Harry M. Blades had been, prior to the time specified in the evidence, designated as a special officer at the defendant's store at their request, under section 308 of the charter. Chapter 378, p. 109, Laws 1897. This provision of the charter, in force at the time of the occurrence hereafter referred to, is as follows:

"The public board, whenever expedient, may on the application of any person or persons, corporation or corporations, showing the necessity therefor, detail regular policemen of the police force, or appoint and swear any number of special patrolmen to do special duty at any place in the city of New York upon the person or persons, corporation or corporations by whom the application shall be made, paying, in advance such regular or special patrolmen for their services, and upon such regular or special patrolmen, in consideration of their appointment, signing an agreement in writing releasing and waiving all claim whatever against the police department and the city of New York for pay, salary or compensation for their services and for all expenses connected therewith; regular patrolmen so detailed shall be paid at the same rate as provided for patrolmen in this act; but the regular or special patrolmen so appointed shall be subject to the orders of the chief of police and shall obey the rules and regulations of the police department and conform to its general discipline and to such special regulations as may be made and shall wear such dress as the department may direct, and shall during the term of their holding appointment possess all the powers and discharge all the duties of the police force, applicable to regular patrolmen. The special patrolmen so appointed may be removed at any time by the police board without assigning cause therefor, and nothing in this section contained shall be construed to constitute such special patrolmen members of the police force, or to entitle them to the privilege of the regular members of the force, or to receive any salary, pay, compensation or moneys whatever from the said police department, or the city of New York, or to share in the police pension fund."

Blades, being thus appointed under this provision as a special patrolman, possessed all the powers, and was required to discharge all the duties, of the police force applicable to regular patrolmen. He was subject to the orders of the chief of police, and was required to obey the rules and regulations of the department and to conform to its general discipline and to such special regulations as may be made. He was not under the control or subject to the orders of the person at whose request he was appointed. He had the authority conferred on a peace officer by chapter 4, tit. 3, pt. 4, of the Code of Criminal Procedure. He could without a warrant arrest a person for a crime committed or attempted in his presence. Code Crim. Proc. § 177. This power he exercised independent of any authority conferred upon him by the defendants. It is quite important in considering this case to keep this relation of Blades to the defendants clearly in mind. That the defendants or their authorized agent could have directed this special officer to make an arrest, and so associate themselves with the act of the officer as to make them generally responsible for an illegal arrest or detention, cannot be disputed, as in the case of any citizen who applied to a police officer to arrest a person that he charges with crime. But in such a case there must be some affirmative act of the third party which in-

duces the police officer to act, so that such third party takes an active part in the arrest, and in effect procures it to be made. It seems to me that this special officer, so far as he acted independently of the defendants, and in pursuance of the power vested in him by virtue of his appointment under the provisions of the charter to which attention has been called, was solely responsible for his acts, and for an arrest under such circumstances the defendants were not responsible.

The plaintiff was called as a witness, and testified: That on the 19th day of March, 1900, she went to the defendants' store to make some purchases, arriving there 20 minutes before 4 o'clock. That she went to several departments of the store, made some purchases, and at 6 o'clock, the usual time for closing, they left the store. The plaintiff was accompanied by her sister, who went to a restaurant in the neighborhood of the defendant's store for a cup of milk, while the plaintiff remained in an adjoining doorway. That as she was standing in the doorway two men came to her and asked her some questions as to her residence, and then asked whether she had lost her pocketbook at Wanamaker's. That she was asked about an umbrella that she carried, when one of the men said: "So you have stolen this umbrella to-day at Wanamaker's, and I am a detective in Wanamaker's, and you have got to go along with me." That the man that spoke then took the plaintiff by the arm and dragged her through the street. That the plaintiff cried for her sister, when the man said: "Never mind your sister, we have got the big thief." He then took her into the defendants' store, to a desk on the ground floor, where an old gentleman was sitting. The man who had her asked whether the umbrella that she had was one of the defendants' umbrellas, and the old gentleman said that it was not. He then asked if the plaintiff was from Hoboken, and he said that she was not, and he then said: "Let her go. . It is none of them. It is not the party. It is not the one we are looking for." By this time the plaintiff's sister had come in, when Blades said: "We will take you upstairs and see what else you have got." And to that the old gentleman said: "No, it is not necessary." Blades said: "Never mind, we will take it anyhow"—when the plaintiff and her sister were taken up in an elevator to the fifth or sixth floor. She testified that while there she was searched, and when she remonstrated Blades said: "I am a detective. I can do what I want. You are the biggest thief in this world"—and calling her other names. After she was examined she was accused of having stolen some small article that was found on her, when Blades presented to her a typewritten paper which recited that she had stolen something from Wanamaker's that day, and that, if she promised never to come back again, he would allow her to go home. The plaintiff refused to sign this paper, and Blades said: "You will have to go to the station house. We have got a patrol waiting for you, and we will bring you to the station house." The plaintiff expressed a willingness to go to the station house, but objected to the patrol wagon, requesting permission to telephone to her brother-in-law, which Blades refused to allow, but said that they would

go to the station house. Subsequently, after the plaintiff had put on her coat to go to the station house, Blades called her in another room and told her that he was sorry that he had made a mistake, and asked her not to tell anybody about it. He then opened the door, called in her sister, and conducted her to a street car, and she went home. She testified that she had stolen nothing. Blades testified that he had seen her secrete some small articles at Wanamaker's, and believed that she had been guilty of larceny, and, having thus seen her in the commission of this offense, he followed her and arrested her. There was absolutely no evidence that either of the defendants or any of their employés had anything to do with this arrest, suggested it to Blades, or that Blades acted under any suggestion or control or under the direction of either of the defendants or any of their employés.

At the end of the testimony counsel for the defendants moved to dismiss the complaint upon the ground that the arrest, if any, that was made by Officer Blades was made in the discharge of his duty as a public officer, and not as an employé of the defendants and that Blades had no authority from the defendants, express or implied, to arrest the plaintiff, and the defendants were not responsible; there being no evidence as to any employment of Blades by the defendants. This motion was denied, and the defendants excepted. The court then submitted the question to the jury, stating that the defendants' contention was that the plaintiff's arrest was not done under any direction of the defendants, but was done upon the officer's own volition, and that the officer had the right to make the arrest, since he was a duly appointed officer of the metropolitan police force of New York, and stating to the jury that the question was "whether the act of Blades, a special police officer, was done in the defendants' service and pursuant to an employment to which his public employment was but incidental"; that "the plaintiff claims that the officer in question was a regular detective or stock watchman employed by the defendants, and that, while making such arrest, he was acting within the scope of his authority from the defendants in this action; and the plaintiff points to the evidence of the detective in question, on cross-examination, that during the past seven years he had made 3,000 arrests in the defendants' store. * * .* However, if you find from the evidence that the arrest was made in the defendants' service, you are next to determine whether the arrest was unlawful. * * * Now, was there an offense committed? That is a question, gentlemen, for you, and you alone, to determine from the evidence. The burden of proving that proposition is upon the defendants, and they must satisfy you as to that by a fair preponderance of evidence. If they fail to do that, gentlemen, to your satisfaction, then upon that proposition you must find for the plaintiff. * * * Let me repeat. If you find that the arrest by Blades of the plaintiff was not done in the defendants' service, then you may find for the defendant. If you believe that a crime was committed in the presence of Blades, in that event, gentlemen, you may find for the defendant. But, if

you believe that the plaintiff did not commit larceny in the presence of Blades, and that the arrest was made in the defendants' service and pursuant to an employment to which Blades' public employment was but incidental, then and only then will you proceed to the question of damages; and in that event I charge you that you may give to the plaintiff what in law is called compensatory damages—that is, such damages as will compensate her for the injuries to her feelings and anxiety of mind." And the jury were fully instructed that, if such arrest was maliciously and wantonly made, they could give punitive damages.

The court then at the request of the plaintiff charged that "if the jury believed that the defendants employed Blades as a detective to watch and care for their property, and intrusted him with the duty of arresting persons whom he believed were attempting to steal the same, then these defendants are liable for his acts, and they cannot shield themselves from liability by procuring him to be appointed a special officer under the provisions of the act which has been referred to on the trial"; that "in order to hold the defendants liable it is not necessary that the plaintiff should prove that defendants gave express authority to Blades to make the arrest in this case, but it is sufficient if the jury shall believe that defendants generally authorized Blades to arrest persons whom he thought were trying to steal their property"; that the jury may find this authority to exist from the fact that Blades is constantly making these arrests, with the knowledge of the defendants, and they continue to retain him in their employ." The court further charged, at the request of the plaintiff, that if no crime was committed or attempted to be committed by the plaintiff, as testified to by Blades and Miss Clancey, defendants are liable, whether Blades thought the plaintiff had committed a crime or not, provided that the arrest was made in the defendant's service and pursuant to an employment to which his public employment was but incidental"; and also that "the burden of proving the arrest was justifiable is on the defendants—that is to say, that the defendants must satisfy the jury by a fair preponderance of evidence that the plaintiff had actually committed a theft of defendants' property"; and also that "in considering the evidence on this question, and in weighing the testimony of Blades, Peiser, and Miss Clancey, the jury may consider the fact that they are detectives employed by defendants to apprehend thieves, that Blades is responsible to defendants for this arrest, and is interested in establishing the fact that he was justified in making the arrest." To each of these charges, at the request of the plaintiff, the defendants took an exception.

The defendants then requested the court to charge that, to make defendants liable, "the jury must find that defendants or any of their employés requested Officer Blades to make the arrest"; that "the defendants are not liable, even if the jury find that the plaintiff did not commit a larceny, if Officer Blades had an honest suspicion as to her actions and acted under a mistaken sense of duty"; that Officer Blades could act upon appearances, and, if the apparent facts were such as a discreet and prudent man would have been led to the belief of plaintiff's guilt, then he was justified in making the arrest, although it turned

out later that the plaintiff was really innocent." All of these requests were refused, and the defendants excepted.

The jury having found a verdict for the plaintiff, the main question is as to whether error was committed in submitting the case to the jury. I have searched this record in vain for evidence to justify a finding that the defendants had ever authorized Blades to make an arrest, or that in exercising the power conferred upon him by law Blades was acting as an agent or employé of the defendants. The provision of the charter to which attention had been called authorized the police commissioners to detail regular patrolmen, or appoint and swear in regular patrolmen to do special duty at any place in the city of New York, upon application of a person or persons, corporation or corporations, giving to the officers thus appointed special powers and functions, and placing them under the direct authority and control of the police commissioners. The person to be appointed such special patrolman is to be determined by the police commissioners, not by the person making the application. All that an individual who desires the protection of a special police officer can do is to make an application to the police commissioners that a special policeman be appointed, and offer to pay the salary of such special policeman, whereupon the police commissioners were authorized to appoint, in pursuance of such request, a special patrolman to do special duty at any place in the city of New York. There is no principle that can make these special patrolmen the agents or representatives of the person upon whose application the patrolmen are appointed, nor make such person responsible for an illegal arrest made by one of these special patrolmen. By their appointment they become public officers, upon whom the law imposed special duties. Such patrolmen are not bound to obey the orders or directions of the person at whose request they are appointed, and when such a one acts upon his own volition, and in the performance of what he considers to be his duty and makes an arrest, he acts under the authority conferred upon him by law. Certainly, if one of the regular patrolmen in the city of New York had been in the defendants' store, and had detected a person in the commission of a crime, and had followed him in the street and arrested him, as it was his duty to do, it could not have been claimed that for that arrest the defendants were responsible; and, if Blades had arrested this plaintiff because he believed that she had in his presence committed a crime, certainly the defendants were not responsible. The arrest was not made in the defendants' store. It was not made at the request or under the direction of any one employed by the defendants. If Blades had taken plaintiff to the station house, instead of back to the defendants' store, there could have been no claim that the defendants were responsible. Yet, in taking her back to the defendants' store, he acted upon his own responsibility, and, notwithstanding the direction of one of the defendants' employés to discharge her, he insisted on searching and detaining her. This certainly was not an act with which the defendants were in any way connected, and for which they were responsible; and this principle is, I think, established in this state by controlling authority.

In Woodhull v. Mayor, 150 N. Y. 450, 44 N. E. 1038, the precise question here presented was, I think, determined. That action was for false imprisonment. The plaintiff was arrested upon the Brooklyn Bridge by a police officer and taken to the station house, where the officer preferred a charge against him for assault and battery. He was taken to the office of a magistrate, where the charge was repeated, and he was subsequently tried and discharged. The Brooklyn Bridge was a public structure, owned by the two cities and used as a public highway—was operated by the cities as common carriers for the transportation of passengers. It was managed and operated by a board of trustees, and the court assumed that these cities were liable for damage caused by the neglect or unlawful acts of their servants done within the scope of their employment; and the question was whether Bishop, the police officer, was such a servant. The board of trustees were authorized "to appoint an adequate police force and to regulate and direct the same for the protection of the said bridge and of the travel over the same, and of all persons, vehicles, railroad cars and animals using or passing over the same, and the policemen so appointed shall have and possess all the powers of policemen of the cities of New York and Brooklyn." The trustees, acting under this authority, had appointed Bishop, and he had served in that capacity upwards of 10 years. In that case the special policeman was appointed by the trustees, for whose acts the defendants were responsible, and not by independent authority at the request of the defendants, and certainly it could have been said with much greater reason that the police officer represented the appointing power than it could be said that he represented the defendants in this case, who were not the appointing power, and had no control over his appointment, or over him after he was appointed. The court, in holding that the defendants were not responsible, said:

"His duties were of a public character, designed for the protection of the people and the execution of the laws of the state. Bishop, as we have seen was appointed by the trustees of the bridge, but his appointment was made pursuant to the provisions of a statute. Whilst he was specially charged with the duty of protecting the bridge, he was also requested to protect the travel over the same, having the same powers with reference thereto of other policemen appointed by the cities. It was as much his duty to look after the welfare of travelers from remote parts of the state or from foreign countries as it was that of the residents of the cities which the bridge connected. He was required, not only to execute the rules and regulations of the bridge, but the laws of the state. If a policeman of the city of New York had been traveling over the bridge upon one of its cars, and had made the arrest of an individual for an alleged assault upon such officer, the municipality would not be liable, and we fail to discover any substantial distinction between that case and the one at bar. * * * Bishop was not in the employ of the cities as an ordinary servant or trainman. He was a policeman, appointed as such and acting in that capacity, and when he stepped inside of the car, placed his hand upon the shoulder of the plaintiff, and announced to him that he was under arrest, he was acting in his character of policeman, and not within the scope of any employment as an agent or servant of the municipalities."

In Sharp v. Erie Railroad Company, 90 App. Div. 502, 85 N. Y. Supp. 553, Wheeler was a policeman of the city of Salamanca and a

deputy sheriff of the county. He was also in the employ of the defendant, with instructions to protect the company's interest on the right of way, to keep tramps from trains and look after robberies that might occur at stations and on the freight cars, in the yards and on the tracks, and in the station, and look after persons in an intoxicated condition on the company's property, and generally to look after crime committed against the railroad company on the right of way. While engaged in the performance of these duties Wheeler discovered the plaintiff's intestate stealing a ride on one of the defendant's freight cars. The plaintiff's intestate jumped from the car and ran from the defendant's right of way into an adjoining piece of property. He was followed by Wheeler, who chased him from the defendant's right of way, calling upon him to stop. After they had passed beyond the defendant's right of way Wheeler called upon him to stop, and upon his failure to do so Wheeler fired a revolver, and the bullet from the revolver struck the plaintiff's intestate and killed him. In an action to recover for the damages thus sustained, the complaint was dismissed, and upon an appeal from the judgment entered upon the dismissal that judgment was affirmed. The court held as a matter of law that Wheeler's act in making the arrest was not the act of the defendant's servant, as Wheeler's duty to make an arrest was entirely independent of his duty to the defendant; that the defendant had no authority to forbid it or to restrain it; that it would be a legal anomaly to hold one responsible for the act of another which he was without authority to forbid and without power to prevent; that the employment of a public peace officer by a private person assumes on the one hand the existence of certain powers and duties as a public officer, and correlatively is conditioned upon the existence of public duties, to be exercised even against the will of the employer.

The case of Healey v. Lothrop, 171 Mass. 263, 50 N. E. 540, where a special officer was appointed at the instance of a keeper of a place of amusement in Boston for the protection of his private property, and paid for by him under the law of that state, it was held that he was not a servant of the place of amusement; and to the same effect are Dickson v. Waldron, 135 Ind. 521, 34 N. E. 506, 35 N. E. 1, 24 L. R. A. 483, 488, 41 Am. St. Rep. 440; Hershey v. O'Neill (C. C.) 36 Fed. 171; and Brill v. Eddy, 115 Mo. 604, 22 S. W. 488.

The only case which could be claimed to be opposed to this view is Tyson v. Bauland, 68 App. Div. 310, 74 N. Y. Supp. 59, subsequently reported in 85 App. Div. 612, 82 N. Y. Supp. 955; but that case is clearly distinguishable, for it appeared there that defendants had given special instructions to the police officer to submit all cases of shoplifting to the president of the company before taking action, and Mr. Justice Hirschberg, in stating the opinion of the court, said that:

"The question is not free from doubt, but I am inclined to the opinion that upon the facts of the case the jury might have properly found that the act of O'Reilly was done in the appellant's service and pursuant to an employment to which his public appointment was but incidental."

It is·not necessary for us to determine whether we would follow that case, as here there is no evidence to prove that the defendants ever authorized Blades to make an arrest, or that in following the plaintiff out of the store and arresting her he was acting under the authority of the defendants, express or implied, or otherwise in the exercise of the powers conferred upon him by his appointment as a special policeman. If these views are correct, it is quite clear that the defendants were not responsible for the act of Blades in making the arrest, and that the court committed error in that respect in submitting the question to the jury.

It follows that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event.

McLAUGHLIN and HATCH, JJ., concur. O'BRIEN, P. J., and PATTERSON, J., dissent.

HATCH, J. I concur with Mr. Justice INGRAHAM in his opinion in this case, save in one respect. Miss Clancey was in the employ of Wanamaker. She did the searching of the plaintiff, and was confessedly acting for the defendant, so that he was liable for her acts. What she did involved a restraint of the plaintiff's person. Therefore a question was presented for the jury. The case, however, was not tried upon this theory. For the act of Blades I do not think the defendant was liable. There should therefore be a new trial.