[Civ. No. 1224.   Third Appellate District.—May 23, 1914.]

## ARTHUR REDGATE, Respondent, v. SOUTHERN PA-CIFIC COMPANY (a Corporation), Appellant.

FALSE IMPRISONMENT—ARREST BY RAILROAD POLICE OFFICER—RELATION OF OFFICER TO RAILROAD COMPANY.—The liability of a railroad company for the acts of a police officer appointed by the governor on its application under the act of 1901 (Stats. 1901, p. 66), does not depend upon the relation of master and servant, or principal and agent, although he serves at the expense of the company.

ID.—ARREST BY RAILROAD POLICE OFFICER—LIABILITY OF RAILROAD COMPANY.—The railroad company incurs no liability for the arrest and detention, by such officer, without a warrant, of a person suspected of larceny, unless it is for "an abuse of authority"; and in this action against the railroad company to recover for false imprisonment, it appears that the officer did not abuse his authority but was entirely justified in making the arrest.

ID.—MALICIOUS PROSECUTION—MALICE AND WANT OF PROBABLE CAUSE—NECESSITY OF ESTABLISHING.—In actions for malicious prosecution the plaintiff must, in order to recover, establish not only malice, but want of probable cause. These two elements are essential, and they must concur or the action will not lie.

ID.—PROBABLE CAUSE—WHAT CONSTITUTES.—Reasonable or probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.

ID.—MALICE AND PROBABLE CAUSE—WHETHER ONE MAY BE INFERRED FROM OTHER.—Malice may be inferred from want of probable cause, but want of probable cause cannot be inferred from malice.

ID.—PROBABLE CAUSE—WHETHER QUESTION OF LAW OR OF FACT.—Probable cause is a mixed question of law and fact, and where the circumstances clearly appear by uncontradicted testimony, it is the province of the court to determine the question of probable cause.

ID.—MALICE—NECESSITY OF PROVING AS FACT.—There is no legal presumption of malice, and although malice may be inferred from want of probable cause or other circumstances, as an inference of fact, still, whether by inference or otherwise, it must be proved as a fact.

ID.—WHAT CONSTITUTES MALICE—EVIL OR SINISTER PURPOSE.—To constitute malice, as the term is used in the law of malicious prosecution, there must be an evil or sinister purpose actuating the person who institutes the proceeding.

ID.—EVIDENCE—SUFFICIENCY TO SHOW MALICE OR WANT OF PROBABLE CAUSE.—In this action against a railroad company to recover damages for the arrest and prosecution of the plaintiff for larceny, the arrest having been made by a railroad police officer and the prosecution having been assisted by the company's agent, an attorney, the evidence is not sufficient to sustain either an inference of malice or of want of probable cause.

ID.—ARREST—WHAT NECESSARY TO JUSTIFY.—It is not necessary to justify an arrest that the complainant be possessed of proofs of guilt beyond a reasonable doubt. All that the law requires is that the complainant have reasonable cause to believe that the crime has been committed and that he is not actuated by malice.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial.   John Hunt, Judge.

The facts are stated in the opinion of the court.

A. A. Moore, and Stanley Moore, for Appellant.

Austin Lewis, and R. M. Royce, for Respondent.

CHIPMAN, P. J.—The complaint charges that defendant "maliciously and without probable cause or any reason therefor, and against the will of the plaintiff and without warrant therefor, caused the plaintiff to be arrested and falsely imprisoned on or about the 4th day of March, 1907, in the city and county of San Francisco." In a second count it is charged that "defendant procured on the 8th day of March, 1907, from the police court" in said city and county, in an action entitled: "The People of the State of California v. A. Redgate and Lloyd Newman, a warrant for the arrest of said plaintiff which said warrant was founded upon a complaint sworn to at the instance of said defendant," charging "plaintiff with having feloniously stolen a certain case of shoes of the value of seventy-five dollars."

The cause was tried by a jury and plaintiff had the verdict assessing his damages at five hundred dollars and judgment was accordingly entered for that amount. Defendant appeals from the judgment and from the order denying its motion for a new trial.

It appeared that a case of shoes had been stolen from the defendant's freight sheds where plaintiff was employed by

defendant as a "checker," and Lloyd Newman was employed as a "trucker." Plaintiff, when called as a witness, thus explained their duties: "The teamster puts freight on the truck right at the door, and he loads from my checking. The trucker brings it to the door. I tell the trucker what to bring to the door. I point out the things he shall put on the truck and bring down—I pick them out myself—they are dumped on a platform on the edge of the door. I check them to see that the numbers are all right and the goods."

It further appeared that James Regan, a detective sergeant of the city police department, of seventeen years' service, found the case of shoes at a second-hand store kept by one Heintz, who informed Regan that one Murphy brought the case of shoes to Heintz' store "for a man named Classen to sell it." Classen was a teamster "driving a team and truck for the Clute Draying Company" and "was hauling a good deal of freight from the railroad shed of the Southern Pacific Company." Thomas Madden was a "special agent or special officer or railroad policeman for the S. P. Company" and had been, for about fifteen years, stationed at Fourth and King streets. He testified: "The loss of the shoes was reported first by the railroad, after that Mr. Regan spoke to me about it. It was soon after. He told me that he had located this particular case of shoes and they belonged to George H. Young. Then we worked together on the case. . . . Mr. Regan went and arrested Classen at the headquarters of Clute, Clute's barn, I went with him. He asked him what he knew about the shoes, and this man Classen said that he was not the only one that was in it, there were others, he said the men in the shed were in on that kind of work, so Mr. Regan asked him if he knew the men, he said he could not call them by name, but he knew them by delivering freight, and he could point them out, and he came with Officer Regan and myself down to the shed and he pointed out Redgate and Newman as the two men. Redgate was the one who was delivering the goods to him and Newman was the trucker, and that the two men made an agreement with him to take the shoes and sell them and divide up the proceeds between them. He said that in the presence of both men and me and Regan, and in their hearing. They denied it, they said they did not do it, they said but very little, they

denied it, that was the nature of what they said. They were booked for larceny. A complaint was sworn to afterwards against them. I swore to that complaint. Mr. Regan and myself called upon Mr. Kelly before that complaint was drawn up. It was after these men were under arrest that I first took the matter up with Kelly.'' Mr. Kelly was an attorney at law of twenty-five years' practice and attended ''to the criminal business of the S. P. Co. in this city and county.'' Witness Madden further testified: ''Q. When you took the matter up with Mr. Kelly, did you and Mr. Regan explain the evidence that was against these men? A. Everything just as I am telling it here, or as near as I can think it. I explained the matter to him as fully as I knew how. Mr. Moore: Q. Did you believe that Redgate and Newman had stood in on the proposition of putting that box of shoes on Classen's truck, with the idea that Classen would sell it, and they would cut up the proceeds? A. From what Classen said I did, from Classen's words. Q. Do you believe it still? A. From what the man told us, I believed it then, and I believe it still, the same as I did then. I do not remember when I first saw Mr. Kelly. The complaint was sworn to after the arrest.''

Regan testified to much the same state of facts. He further testified: ''Q. Did you believe at the time they were arrested, at the time the complaint was filed, that there was probable cause to believe they had committed an act— A. I did. Q. Do you believe it yet? A. I do; the shoes were stolen and they were all concerned in it, if Classen's word was to be believed. Classen drove a bonded warehouse truck, and he was not receiving any goods out of there that did not come from a certain place, as I understood from Classen any goods that he got on the truck outside of that he had no right to get it. Q. And you believe that he got it through this checker and this trucker? A. Well, that was his say so, he accused them; he did not think over it a minute, when I asked him he said 'I ain't the only one, Regan, there were others.' Newman and Redgate denied it. They said they did not know anything at all about it, they did not know he got this case out of there at all. They claimed that they had not given him this case. Q. Did they refuse to answer questions in regard to the matter, particular questions? A. They

would not make any statement whatsoever.   Q. Did you ask them to make a statement?   A. I did.''

Classen testified that he ''got a box of shoes down there at the railroad sheds sometime during the latter part of the month of February, 1907, from Mr. Redgate and William Newman.''   He explained what he did with the shoes and what took place after his arrest.   Speaking of what he said to the arresting officers, he testified: ''I denied having taken them at first, and after a while I told them that I took them, they were given to me, and who the men were that gave them to me.   I did not tell them the exact names of the parties, because I did not know what their names were, I only knew them working down there in the sheds.   I told them that they told me to take the shoes.   I told them they were two men working in the freight sheds, and they told me to take the shoes and dispose of them, and they told me who they were, I told them I did not know who they were, I would have to identify them, I did not know their names, who they were, I knew who they were.   I stayed in jail until the following Monday, then I went down to the freight shed.   I saw Mr. Redgate.   I identified him as one of the men.   I afterwards saw the other, Newman, in the city jail.   Mr. Moore: Q. Was there also some conversation .in jail when you saw Redgate and Newman and the officers there afterwards?   A. Yes, they spoke of these two men being the men, and what they did with it, and told them to tell everything out, and all like that, that .was sort of really the conversation in substance, there was not much said.   The Court: Q. Did you identify either of these two men whom you saw in the jail?   A. Yes, sir.   Q. Do you remember your saying anything as to whether these were the men, or what they said to you at the time?   A. Well, I said they were the two men, that is what I told the officers at the time.''

Attorney Frank P. Kelly testified: ''I attend to the criminal business of the S. P. Co. in this city and county.   There was called to my attention in the first part of March, 1907, a matter in respect to Arthur Redgate and Lloyd Newman, employees of the company, at their freight shed here in this city.   In the course of my business I was required to investigate all cases of theft from the sheds of the coast division.

24 Cal. App.—37

Mr. Regan came to me, and told me there was a theft of a box of shoes, and presented to me all the necessary testimony of witnesses to prove that the shoes had been stolen from there, and on their statement that they had these witnesses, I wrote out a complaint. It was read here in evidence —against Arthur Redgate and Lloyd Newman, who was checker and trucker at the same time. I wrote out the complaint against Arthur Redgate and Lloyd Newman, because from the officers' statement that Arthur Redgate as the receiving clerk there, or checker, had stated to Lloyd Newman that he should take the shoes and give them to somebody, and take them down town and sell them, and bring back the proceeds, and divide them, that was the statement made to me. From the time the information was brought to me about 30 hours elapsed after they were arrested. This delay was for the reason that the officers did not have full information, so that I could make out the complaint. The names of the parties that came to me with this information were officer Regan and special officer Madden of the Southern Pacific. . . . Q. Was anything stated by the officers to you with reference to a teamster of the name of Classen? A. Yes, sir; they told me that this man Classen, who, I think they originally arrested, or did arrest, had hauled these shoes away to some place on Sixth Street, that they had found them, and that Classen told them that Redgate and Newman had ordered him to haul them away.'' The attention of the witness was called to the fact that the arrest was made on the fourth day of the month (March) and complaint was filed on the eighth. The witness stated that sometimes it occurs that complaints are made out a day or so before they are filed; that Redgate and Newman were already under arrest; that he, witness, had no feeling of malice toward these men and that he had never seen Redgate before that time. ''Q. Did you feel at that time that there was proper cause to believe that Redgate had committed this offense? A. Yes, sir.''

It appeared that Redgate and Newman were subsequently brought before the police court upon the complaint charging felony, to wit, grand larceny, at which time witnesses Classen, Regan, Heintz, and Young, the owner of the stolen shoes, testified, and, on April 6, 1907: ''The court. after having

said matter under advisement, orders said action to be dismissed and the defendants discharged.''

Plaintiff Redgate testified: ''I was arrested on the 4th day of March, 1907, at freight shed Fourth and Townsend streets, by detectives Regan and Madden. I do not know whether either of them were railroad policemen or not. I did not know what they were arresting me for, they said 'Come along with me.' I went to the office at the shed, turned in my bills and explained to the clerk and I said 'These men are arresting me for something I don't know anything about.' They took me up in the Flood building. They took me into an office there, I suppose it was some railroad detective office. He asked me my name, where I was born, and that was all, and then they took me down to the jail on Eddy and Mason, and they charged me right there with grand larceny. They booked me on the book my name, and charged me, and then they locked me up. I was in jail about three days. I got out on bonds after that. I had to have an attorney to get out. I paid him fifty dollars. I appeared for trial in the police court. I don't know the exact date, they did not bring my case up. Then it came up again. I was brought up before the court three times, the first time nothing was said or done and I was taken back to jail—after I was released on bail which was on the third day, I was twice brought before the court, and on the third occasion the charge was dismissed and the only evidence on that occasion was some man who had the shoes stated he did not know us. Judge Conlin dismissed the case. At the present time I am a butcher. Notice of my arrest appeared in the *Bulletin, Chronicle,* and *Daily News.*''

The record of the trial shows that the witnesses above named testified at the preliminary hearing. Plaintiff testified, on cross-examination, that at the time he was arrested the officers brought Classen there but witness testified that he did not hear any conversation nor did he see Classen point him out; that when the detective asked him whether he had given Classen the shoes he said, ''No, I had given him no shoes.'' He also testified that the records of the company showed that, on February 21, the day it is claimed the goods disappeared, Classen signed a receipt to defendant for some goods belonging to the U. S. government and that Newman

was the trucker on that occasion and that was the first time he had ever seen Classen. He further testified: "I did not know what I was arrested for until I was booked—I did not know what they had Classen there for, I am sure, I suppose I thought they had him there, and arrested him and had him under watch. Classen was brought into a room with Newman and myself in the jail; I was asked if I knew him, so was Newman; we said yes. I was asked if I wished to have a talk with him and said no—so did Newman."

Newman testified as follows: "I had not been at sheds for 5 days prior to my arrest. I was arrested at 11:30 P. M., March 4, 1907, on China Avenue, on my way home, 203 Paris Street; by detectives brought to the city jail. Redgate was brought out and asked if he knew me; he said yes, I was his trucker. I was never asked about Redgate prior to my arrest. Redgate only had goods put on the trucks that appeared in the way bills. I was kept locked up at the jail three days before being taken to court—I was not taken to court because there was no charge; Redgate and I were jointly charged—as soon as I got before the court I gave bail."

The foregoing is substantially all the evidence in the case.

1. It is contended by appellant that the evidence is insufficient to sustain the first count of the complaint for false imprisonment.

The defendant had no connection with Regan, who was a member of the police force of the city, and cannot be held responsible for his acts for, as far as appears, he acted on his own initiative. Its responsibility, whatever it was, is for the acts of Madden alone. His powers were those of a peace officer, as will appear from the following act of the legislature under which he was appointed:

"Section 1. The governor of the state of California is hereby authorized and empowered, upon the application of any railroad or steamboat company, to appoint and commission during his pleasure one or more persons designated by such company and to serve at the expense of such company, as policeman or policemen, with the powers of police officers, and who, after being duly sworn, may act as such policeman or policemen upon the premises, cars or boats of such company. The company designating such person or per-

sons shall be responsible civilly for any abuse of his or their authority.

"Sec. 2. Every such policeman shall, when on duty, wear in plain view a shield bearing the words 'railroad police' or 'steamboat police,' as the case may be, and the name of the company for which he is commissioned." (Stats. 1901, p. 666.)

Defendant's liability, whatever it may be, for the acts of Madden, does not spring from the relation of employee or servant, for he bore no such relation to defendant. It has been frequently held, under statutes similar to the above quoted, that special officers appointed thereunder derive all their powers from the appointment made by the civil authorities, here by the governor of the state. The authority to make arrests, with which plaintiff was clothed, was in terms given by the statute and in no sense can be said to arise from the relation of master and servant, or principal and agent, existing between the special officer and the company at whose application he was commissioned; and the fact that he is "to serve at the expense of such company" does not affect his *status* as that of a police officer. The rule of *respondeat superior* has no application where there is no evidence tending to show that the company was instrumental in causing the arrest or subsequent prosecution. The foregoing views are fully supported by the following cases, cited by appellant: *Adler* v. *White City Construction Co.,* 147 Ill. App. 20; *Samuel* v. *Wanamaker,* 107 App. Div. 433, [95 N. Y. Supp. 270]; *Hershey* v. *O'Neil,* 36 Fed. 168, under the New York statute; *Wells* v. *Washington Market Co.,* 19 D. C. 385; *Tolchester Beach Imp. Co.* v. *Steinmeier,* 72 Md. 313, [8 L. R. A. 46, 20 Atl. 188]. Other cases are cited in the opinions to like effect. Where, however, the officer acts in a dual capacity and the special policeman "reported for duty to the foreman of the defendant and acted in pursuance of instructions received from them," the defendant was held liable. (*Illinois Steel Co.* v. *Novak,* 84 Ill. App. 641.) See, also, where the head janitor and doorkeeper of a theater was also a special police officer and had not been relieved from his duties in the theater, in the discharge of which the question arose: *Dickson* v. *Waldron,* 135 Ind. 507, [41 Am. St. Rep.

440, 24 L. R. A. 483, 34 N. E. 506].    (See, also, *Brill* v. *Eddy*, 115 Mo. 596, [22 S. W. 488].)

It is very clear that defendant incurred no liability for the arrest and detention of plaintiff up to the time complaint was filed and warrant of arrest issued, unless it be for an ''abuse of authority'' by Madden, for no agent of the defendant had anything to do with the case to that time.    We think, however, that Mr. Kelly's testimony shows that in preparing the complaint upon which alone a warrant of arrest could issue, and in subsequently conducting the examination, he was acting as the agent of defendant.    We do not mean to hold that the defendant could not, without incurring a possible liability, employ an attorney to assist in the trial of the case after a complaint had been filed and the warrant of arrest was served, through some agency other than defendant's.    What we hold is that, in assuming, as the attorney and agent of defendant, to advise the officers that there was sufficient evidence to hold the accused and in preparing the complaint and causing warrant to issue and in subsequently taking charge of the examination, as we may infer he did, Kelly placed the defendant in the attitude of an accuser, but it remained with plaintiff to show that it acted through malice and without probable cause.    Furthermore, the statute, under which the special officer was appointed, expressly provides that the defendant ''shall be responsible civilly for any abuse of his authority,'' which we take it means, in making the arrest, he must have had reasonable cause for believing that the accused had committed the crime for which he was arrested.

It results from the foregoing views that for the original arrest and detention under it, which was made without a warrant, the defendant is liable only for an abuse of the authority of the special officer who jointly with detective Regan made the arrest; and defendant is liable for the subsequent proceedings initiated and conducted under the advice and direction of its attorney, Kelly, if his conduct was without probable cause and with malice.    Inasmuch as both Kelly and Madden proceeded upon the same facts, we need only inquire whether Madden abused his authority in causing the arrest of plaintiff, and whether Kelly was legally justified in preparing the complaint against plaintiff and causing his alleged crime to be examined into.

The evidence shows that plaintiff was arrested without a warrant and detained under that arrest until, upon the advice and direction of Kelly, a complaint was filed and a warrant was served, whereupon plaintiff gave bond and was released from custody. It seems to us that, under the circumstances, the special officer, Madden, did not abuse his authority but was entirely justified in making the arrest.

Classen was a teamster and received freight only as delivered to him by plaintiff, the checker, and Newman, the trucker, both of whom were defendant's employees in charge of the freight shed. They were the persons through whom the theft, with the aid of Classen, could easily have been effected. Having traced the case of shoes from Heintz to Classen he at first denied taking it, but finally admitted his participation but claimed, what might very probably have been the fact, that others were implicated and, when called upon to name them, he identified and pointed out plaintiff and Newman as his confederates—both of whom were, as we have seen, in a position to assist in consummating the theft. It seems to us that not only was Madden justified in arresting plaintiff, but would have been derelict in his duty not to have done so. He had the powers of a police officer (act of 1901, p. 666) ; and as such could make an arrest without a warrant where a felony has been committed and "he has reasonable cause for believing the person arrested to have committed it." (Pen. Code, sec. 836.)

2. The second count in the complaint alleges that plaintiff was charged with the crime of felony and prosecuted by trial upon such charge "maliciously and without probable cause."

It was said in *Smith* v. *Liverpool etc. Ins. Co.*, 107 Cal. 432, 436, [40 Pac. 540, 542] : "No principle is better established than that in actions for malicious prosecution the plaintiff must, in order to recover, establish not only malice, but want of probable cause. Those two elements are essential, and they must concur or the action will not lie. (*Potter* v. *Seale*, 8 Cal. 217, 220; *Anderson* v. *Coleman*, 53 Cal. 188.) 'The primary question to be considered in this class of cases,' as was said in *Grant* v. *Moore*, 29 Cal. 644, 'is the want of probable cause for the prosecution complained of, and this must be established before plaintiff can recover; and the burden of proof is upon the plaintiff.' (*Jones* v. *Jones*, 71 Cal.

91, [11 Pac. 817].) Reasonable or probable cause has been defined to be: 'A suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.' (*Potter* v. *Seale,* 8 Cal. 217, and cases there cited.) "

Malice may be inferred from want of probable cause, but the latter cannot be inferred from malice. (*Potter* v. *Seale,* 8 Cal. 217, 220.) Probable cause is a mixed question of law and fact and where the circumstances clearly appear by uncontradictory testimony it is the province of the court to determine the question of probable cause. (Id.) "Public policy and public security alike require that prosecutors should be protected by the law from civil liabilities; except in those cases where the two elements of malice in the prosecution, and want of probable cause for the prosecution, both concur," (Id.) and "if the prosecutor have reasonable grounds for his belief and act thereon in good faith in causing the arrest, he shall not be subjected to damages merely because the accused is not convicted." (*Carpenter* v. *Ashley,* 15 Cal. App. 461, 467, [115 Pac. 268].)

There is no legal presumption of malice and although malice may be inferred from want of probable cause or other circumstances, as an inference of fact, still, whether by inference or otherwise, it must be proven as a fact. (*Griswold* v. *Griswold,* 143 Cal. 617, [77 Pac. 672].) "To constitute malice there must be *malus animus* denoting that the party who instituted the proceedings was actuated by wrong motives"; 26 Cyc. 48; i. e., he must have had in his mind some evil or sinister purpose. There is no evidence in the record directly indicating malice nor are there any circumstances which would justify the inference of malice unless it may be inferred from proof of want of probable cause and from the discharge of plaintiff at the hearing of the complaint, and this latter circumstance in itself furnishes no basis for an inference of malice.

We do not think there was evidence sufficient to support an inference of want of probable cause. The facts were fully stated to Mr. Kelly who prepared the complaint. He did not know plaintiff and he testified that he had no ill feeling toward him. He knew him to be a trusted employee of defendant and had no reason or motive to prosecute him other

than an honest belief from the facts given him that plaintiff was guilty and should be punished. He delayed a short time from taking immediate action to that end until he could investigate the case and satisfy himself that there was probable cause for filing a complaint, and we do not think the delay was so unreasonable as to warrant an inference that he, in his final action, was governed by motives of ill will or malice toward plaintiff or proceeded otherwise than from what he believed and was justified in believing was his duty. Upon the subject of probable cause the following California cases may be consulted: *Dwain* v. *Descalso,* 66 Cal. 415, [5 Pac. 903]; *Smith* v. *L. L. & G. Ins.* Co., 107 Cal. 432, [40 Pac. 540]; *Davis* v. *Pac. Tel. & Tel. Co.,* 127 Cal. 312, [57 Pac. 764, 59 Pac. 698]; *Booraem* v. *Potter Hotel Co.,* 154 Cal. 99, [97 Pac. 65].

It is claimed that, as plaintiff was the confederate of Classen and could not be convicted on the latter's uncorroborated testimony, it showed want of probable cause to arrest plaintiff on Classen's statement. It is not necessary to justify an arrest that the complainant be possessed of proofs of guilt beyond a reasonable doubt. All that the law requires is that the complainant have reasonable cause to believe that the crime has been committed and that he is not actuated by malice. Classen occupied a position of some trust and confidence with his employer. There was nothing in his past life to awaken doubt as to the truthfulness of his story and there was no reason why he should have falsely implicated plaintiff.

*Atchison, T. & Santa Fe Ry. Co.* v. *Smith,* 60 Kan. 4, [55 Pac. 272], was a case where the complaint was based mainly upon the confession of a confederate. There were some slight corroborating circumstances, as there were in the present case, but the charge rested chiefly on the confession. The person charged was acquitted but in his subsequent action for malicious prosecution it was held that the company did not act without probable cause.

In our opinion Kelly was justified in taking the steps he did upon the information given him and that plaintiff failed to establish either want of probable cause or malice.

Error is predicated of certain instructions given and certain others refused. We do not find it necessary to pass upon these assignments of error. It is not likely, should another

trial take place, that the evidence would be materially different, in which case a verdict for plaintiff would not be permitted to stand.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.