SELMA GRAALUM v. RADISSON RAMP, INC., AND OTHERS.[1]

June 3, 1955.

No. 36,480.

---

[1]Reported in 71 N. W. (2d) 904.

*Freeman, Peterson, Hoppe & Gaughan,* for appellant.

*Kelly, Mangan & Kelly,* for plaintiff-respondent.

*D. J. Shama,* Assistant City Attorney, for respondent City of Minneapolis.

MATSON, JUSTICE.

Defendant Radisson Ramp, Inc., in a personal injury action appeals from an order denying its alternative motion for judgment or a new trial.

Defendant Radisson Ramp, Inc., operates a parking garage in downtown Minneapolis at 21 South Seventh street, with the driveway leading from the street directly across the sidewalk to the garage ramp or entrance. The sidewalk is 14 feet six inches wide from the building line to the curb, and the driveway has a width of 23 feet and 11 inches. Herein we shall refer to Radisson Ramp, Inc.,

as the defendant and to the other defendant, city of Minneapolis, as the city.[2]

On December 21, 1951, plaintiff, who was then 67 years old, fell and broke her hip when she was crossing defendant's driveway. About 6 p. m. on that day, plaintiff was walking westerly on Seventh street to catch a streetcar on Hennepin avenue. When she arrived at the driveway her progress, as well as that of other pedestrians, was blocked by a car which, on its way into defendant's garage, was parked temporarily across the sidewalk. About 10 or 12 pedestrians were coming from each direction. Leonard E. Miller, a Minneapolis police officer, stationed at the driveway entrance, signaled the pedestrians to stop. Plaintiff stopped and did not start again until the police officer signaled the pedestrians to proceed.

Taking, as we must, the evidence in the light most favorable to the verdict, the car was parked on the level portion of the sidewalk in such a position that plaintiff was compelled to proceed to her right around the rear of the car. Although the portion of the sidewalk occupied by the driveway sloped as a whole only about one inch in eight feet from the building line to the curb, the evidence establishes that the approach leading from the street level to the sidewalk level, for a distance of about two or two and one-half feet, had a pronounced slope. It was while plaintiff was walking on this pronounced slope to the rear of the car that she slipped, fell, and broke her hip.

The jury returned a verdict for the plaintiff. The trial court denied defendant's motion for judgment notwithstanding the verdict or a new trial. Defendant appeals from the court's order. We have issues as to whether the evidence sustains the finding of negligence against the defendant and also as to whether the evidence sustains a finding that the police officer was an agent of the defendant Radisson Ramp, Inc.

We shall first consider the evidence and the law as to the relationship between the defendant Radisson Ramp, Inc., and Leonard E. Miller, the police officer. The defendant had an arrangement with

---

[2]The action was dismissed as to the individual defendants.

the city whereby a policeman was assigned full time to the driveway in front of the Radisson Ramp. The policeman was paid by the city of Minneapolis and the defendant reimbursed the city monthly in an amount equal to his salary. Whenever the policeman worked more than 40 hours per week in front of the Radisson Ramp, defendant paid him directly for such overtime. The policeman controlled the flow of automobile traffic in and out of the garage and regulated the flow of pedestrians over the sidewalk in front of the ramp. Policeman Miller had worked in front of the Radisson Ramp for one and a half years before the accident.

Employees of the garage directed Miller when they could handle more cars. Defendant furnished the sand and pan which Miller used in sanding the sidewalk. The garage manager gave him detailed instructions as to how to conduct the operations in front of the ramp. Upon arrival each morning, policeman Miller reported to the garage manager.

The policeman testified that he was working overtime whenever he worked beyond 6 p. m. except on Monday evenings. Although it is here of little legal significance, it is to be noted that the accident did not occur on a Monday and that the policeman was working overtime when the plaintiff fell.

 In directing pedestrian and motor traffic on defendant's driveway across the public sidewalk, was Miller performing such duties in his official capacity as a police officer of the city or as a servant of a private employer, the defendant? It is well settled that a police officer, separate and apart from his official capacity, may undertake to act in a capacity which in law constitutes a civil agency. In fact it is practically a universal rule that:

"* * * the mere fact that one in private employment also has a commission from the public as a police officer does not protect his private employer from liability to third persons for acts which are referable to the former's capacity as private employee, although the private employer is not responsible for acts or omissions referable to his character as a public officer." 35 Am. Jur., Master and Servant, § 542.

When private persons employ police officers with the consent of a municipality to do special work for them, and such officers are engaged in the performance of their duties to their private employers and are acting within the scope of their powers and duties, they are servants and employees of such private persons.[3] The private persons thereby become liable for the officer's negligent acts committed in the line of his duty.[4] Private persons will be relieved from liability for the acts of commissioned police officers when performed in their official capacity although private persons paid such officers for services in and about the private employer's property.[5]

■ The difficult problem lies in determining in what capacity the police officer was acting at a given time. Where upon conflicting evidence the facts are inconclusive, the question as to whether he was acting in his capacity as a servant of his private employer or in his capacity as an official of the public is for the jury.[6] Some authorities maintain that police officers are prima facie public officers for whose wrongful acts the private employer is not liable.[7]

■ Since the mere fact that an employee may be a police official does not exempt his private employer from liability to third persons, it becomes necessary to ascertain whether the master-servant relationship existed between officer Miller and the defendant. A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is

[3] 35 Am. Jur., Master and Servant, § 542; 57 C. J. S., Master and Servant, § 565; Kusnir v. Pressed Steel Car Co. (S. D. N. Y.) 201 F. 146.

[4] Rand v. Butte Elec. Ry. Co. 40 Mont. 398, 107 P. 87; Walters v. Stonewall Cotton Mills, 136 Miss. 361, 101 So. 495; Empire Oil & Refining Co. v. Fields, 181 Okl. 231, 73 P. (2d) 164.

[5] Pennsylvania R. Co. v. Kelly (2 Cir.) 177 F. 189, 30 L.R.A.(N.S.) 481.

[6] Neallus v. Hutchinson Amusement Co. 126 Me. 469, 139 A. 671, 55 A. L. R. 1191; Deck v. Baltimore & Ohio R. Co. 100 Md. 168, 59 A. 650; Layne v. Chesapeake & Ohio Ry. Co. 66 W. Va. 607, 67 S. E. 1103. Not employees as a matter of law, see Krowka v. Colt Patent Fire Arm Mfg. Co. 125 Conn. 705, 8 A. (2d) 5.

[7] Hayes v. Sears, Roebuck & Co. 34 Wash. (2d) 666, 209 P. (2d) 468; 22 Am. Jur., False Imprisonment, § 45.

controlled or is subject to the right to control by the master.[8] This court has stated that the *right* of control and not necessarily the exercise of that right is the test of the relation of master and servant.[9] "Basically, it is the distinction between a person who is subject to orders as to *how* he does his work and one who agrees only to do the work in his own way."[10] The manager of defendant's parking garage testified that he told officer Miller in some detail how to conduct the operations in front of the ramp. Officer Miller reported to the manager of the ramp when he arrived each morning. The manager told him what to do and through the other employees of the ramp informed officer Miller during the day when the ramp was full. The fact that officer Miller was paid on the basis of time worked is also indicative of the master-servant relationship.[11] Officer Miller denied that he received any instructions relative to his duties from Radisson Ramp, Inc. He claimed he received all his orders from the police sergeant. The evidence was conflicting and inconclusive and therefore the issue was properly submitted to the jury. The evidence sustains the jury's finding that officer Miller was acting in his capacity as an employee of the defendant at the time of the accident.

■ We turn to the issue of defendant's negligence. Generally speaking the duty of keeping a sidewalk in reasonably safe condition for travel rests upon the city and not upon the abutting owners or occupants.[12] Clearly, the abutting owners or occupants are not liable to pedestrians for injuries caused by stumbling or slipping on sidewalks which have become slippery and dangerous from *natural* (as distinguished from artificial) accumulations of ice and snow.

---

[8]Restatement, Agency, § 2(2).

[9]Frankle v. Twedt, 234 Minn. 42, 47 N. W. (2d) 482; see, Castner v. Christgau, 222 Minn. 61, 24 N. W. (2d) 228.

[10]Frankle v. Twedt, 234 Minn. 42, 47, 47 N. W. (2d) 482, 487.

[11]See, Restatement, Agency, § 220(2) (g).

[12]Bentson v. Berde's Food Center, Inc. 231 Minn. 451, 44 N. W. (2d) 481, 22 A. L. R. (2d) 733; Boecher v. City of St. Paul, 149 Minn. 69, 182 N. W. 908; McDonough v. City of St. Paul, 179 Minn. 553, 230 N. W. 89; Burke v. O'Neil, 192 Minn. 492, 257 N. W. 81; 13 Dunnell, Dig. (3 ed.) § 6829; see, Annotation, 41 A. L. R. 212.

Boecher v. City of St. Paul, 149 Minn. 69, 182 N. W. 908. If, however, an abutting owner maintains or uses his property in a manner whereby dangerous ice is caused to form on the adjacent sidewalk as a result of artificial, as distinguished from natural, causes, he is liable for injuries proximately caused to a pedestrian who slips and falls on such ice.[13]

■ This court has recognized that these principles of liability are not changed by the fact that the affected portion of the sidewalk is crossed by a driveway which is used by customers of an abutting occupant. Abar v. Ramsey Motor Service, Inc. 195 Minn. 597, 263 N. W. 917. In an earlier case we held that an abutting owner is not liable to a pedestrian for injuries caused when she slipped and fell on a driveway across a sidewalk whereon a *natural* accumulation of ice and snow had been formed into irregular and dangerous ridges by the wheels of vehicles and the feet of pedestrians. McDonough v. City of St. Paul, 179 Minn. 553, 230 N. W. 89.[14]

In both the Abar and McDonough cases we have a normal use of a combination of a sidewalk and a driveway. It is recognized, however, that, where an abutting owner or occupant makes an *extraordinary* use of a sidewalk for his own convenience, he owes a duty to the public to exercise due care in seeing that the affected portion of the sidewalk is maintained in a safe condition for the passage of pedestrians.[15]

■ An extraordinary use of an adjacent sidewalk arises when, in the light of all the circumstances of the particular case, such use is not only for the personal convenience and benefit of the abutting occupant but is also of such a nature, in *kind* or in *degree*, that a condition is created which interferes with, and is in derogation of,

[13]Johnson v. Elmborg, 165 Minn. 67, 205 N. W. 628; see, Bentson v. Berde's Food Center, Inc. 231 Minn. 451, 44 N. W. (2d) 481.

[14]As to the liability of a city which has notice of dangerous ridges and irregularities in accumulations of ice and snow on sidewalks, see 13 Dunnell, Dig. (3 ed.) § 6829.

[15]Perrigo v. City of St. Louis, 185 Mo. 274, 84 S. W. 30; Granucci v. Claasen, 204 Cal. 509, 269 P. 437, 59 A. L. R. 435; see, Latell v. Cunningham, 122 Minn. 144, 142 N. W. 141; Annotation, 59 A. L. R. 441.

a normal use of the sidewalk by the public. The liability arises not from the fact that the defendant is the owner or occupant of the property abutting on the sidewalk, but from the fact that he has, wilfully or negligently, been instrumental in causing the hazardous condition which gives rise to a duty which the law imposes upon him. The extraordinary use may stem from a *kind* of use which is in derogation of a sidewalk's normal function as an aid to travel, such as the installation of a manhole for the reception of coal,[16] a private cellarway, vault, a raised approach or passageway leading to a building entrance, etc.[17] An extraordinary use may also arise from acts which, though intrinsically consistent with the usual function of a sidewalk or driveway when conducted in a normal manner and context, lose their customary status because they are performed in such unusual volume and under such conditions that they unduly interfere with a safe and normal use of the affected portion of the sidewalk. Vehicular travel over a sidewalk to an abutting occupant's place of business may, periodically or otherwise, become so heavy that a sidewalk ceases to perform its normal function as a reasonably safe route for pedestrian travel. Such use is abnormal in degree rather than in kind although the circumstances of a particular case may involve both phases.

The defendant's use of the sidewalk and driveway as an entrance to the ramp leading into its parking garage was here extraordinary in both *degree* and *kind.* First we consider the requirements of a normal use of the sidewalk area by pedestrians. The evidence shows that 4,000 pedestrians normally use the sidewalk each hour between 4 and 6 p. m. and at noon. At other times the pedestrian load varies from 2,300 to 2,500 per hour. Unmistakably here the sidewalk's normal function involves an exceptionally heavy pedestrian use by the public. Has such heavy use by the public been unduly burdened by defendant's activities? The driveway, which covers the entire width of the sidewalk, was on the day of the accident traversed by 570 entering cars between 8 a. m. and 4:30 p. m. Officer Miller estimated

[16]See, Latell v. Cunningham, 122 Minn. 144, 142 N. W. 141.

[17]See, Shepstedt v. Hayes, 221 Minn. 74, 21 N. W. (2d) 199.

the entering cars to be 700 in number. Approximately the same number of vehicles again used the driveway in leaving the garage. The evidence does not establish the volume of automobile traffic in the evening.

Obviously the incoming and outgoing flight of motor vehicles to and from a parking garage located in the congested pedestrian area of a large city may reach such extraordinary proportions that the law imposes upon the garage proprietors, for whose benefit the vehicular traffic over the sidewalk is permitted, an affirmative duty to exercise ordinary care for the safety of pedestrians. In any event it is clear that the normal pedestrian function of the sidewalk was here unduly burdened and interfered with by the passage of motor vehicles patronizing the defendant's parking garage. The interference was not merely one of *degree* as to volume but also as to *kind* in that the sidewalk was frequently used as the temporary parking place for motorists who cannot proceed while blocked by preceding vehicles. It follows that the driveway area of the sidewalk is used not only for normal automobile passage but also as a part of defendant's parking facilities. Clearly, such use of the sidewalk is extraordinary in both kind and degree. In addition to such extraordinary use, we have the additional fact that the sudden stopping of automobiles on the sidewalk jarred loose from the vehicles large quantities of snow which would not otherwise be naturally deposited on the sidewalk.

Upon the evidence the negligence of the defendant was a question of fact for the jury. Plaintiff fell, as the jury could find, on that portion of the driveway which formed a pronounced slope from the sidewalk level to the street level. This slanting area, which was maintained for the benefit of the defendant, was covered with a treacherous film of ice which made walking extremely hazardous. Patches of ice upon a sidewalk, especially upon a sharply slanted surface, or when such patches are covered in part with snow, are even more treacherous than rough and uneven ice which covers an entire walk.[18] The temperature was nine degrees above. Officer

---

[18]See, Nichols v. Village of Buhl, 152 Minn. 494, 193 N. W. 28.

Miller testified that when the temperature was low there was always a small amount of ice on the driveway from the skidding of wheels. The sidewalk was devoted to an extraordinary use, for the benefit of the defendant, and it owed to the public a duty of exercising reasonable care in providing a safe passage for plaintiff and other pedestrians. The jury could find that defendant breached this duty by blocking the sidewalk and by leaving available thereon for pedestrian passage only a route over a pronounced incline which was icy and slippery. Plaintiff, as directed by defendant's servant, officer Miller, proceeded to the rear of the parked car where she fell on such incline. The jury's verdict is sustained.

The order of the trial court is affirmed.

Affirmed.