## RUTH RUDD AND ANOTHER v. LYCEUM DRAMATIC PRODUCTIONS, INC., AND OTHERS.

85 N. W. (2d) 61.

August 2, 1957—No. 36,967.

*Richards, Janes, Hoke, Montgomery & Cobb* and *Greer E. Lockhart,* for appellants.

*William H. DeParcq, Chester D. Johnson, Robert N. Stone,* and *S. Harry Gainsley,* for respondents.

DELL, CHIEF JUSTICE.

This is an action by the plaintiff Ruth Rudd to recover damages for personal injuries suffered by her as a result of a fall on an icy public sidewalk in front of defendants' property.[1] The action was consolidated for trial and on this appeal with that of her husband, Oscar Rudd, who seeks to recover the medical expenses he incurred as a result of his wife's injuries. The jury found for the plaintiffs in both cases and the defendants appeal from orders denying their alternative motions for judgments notwithstanding the verdicts or a new trial.

The complaints allege that the defendants were negligent in allowing water to spill and drain out onto the sidewalk and in allowing water to collect and freeze there. Defendants deny negligence generally and further plead assumption of risk and contributory negligence on the part of Ruth Rudd, hereinafter referred to as the plaintiff. However, the defenses of assumption of risk and contributory negligence were abandoned by the defendants at the time of the oral argument on this appeal and hence need not be considered.

The property involved, the Lyceum Theatre building, is located on the south side of Eleventh Street, between Marquette and Nicollet Avenues. Eleventh Street runs in a general easterly-westerly direction. The theatre is an old building approximately 120 feet wide and four stories high. There is a portico at the front of the building with six pillar-

---

[1] The jury found for the defendant city of Minneapolis in both cases, and it is not involved on this appeal.

like structures extending somewhat out from its face. On the top of these pillars and in the middle of the building is a cornice, estimated from 50 to 70 feet wide.[2] It is 30 feet from the sidewalk at floor level with the third floor. This cornice projects about three or three and one-half feet out from the building and is one foot deep. Another cornice of the same width is located about 10 feet higher than the first, at approximately fourth-floor level. It projects 12 or 15 inches out from the building and is not as deep as the first cornice. A ledge also extends across the entire front of the building at roof level. In the center of the building and below the lowest cornice is a modern-type marquee canopy.

Two downspouts are located on the front of the building just outside the most easterly and most westerly pillars about 20 feet from either end of the building. They connect the uppermost projection of the portico with the lower cornice and, in turn, lead from the lower cornice to the sidewalk in front of the building. At the time of the accident they were corroded and stopped up with debris. Portions of the spouts had completely rusted through. Although the testimony is somewhat confusing, it appears that there is a grate in the sidewalk at the base of the westerly downspout which would catch any water that did flow down that spout. A third downspout, located just off center of the building, leads from the marquee canopy to the sidewalk. It was in good working order. The sidewalk in front of the building is approximately 10 feet wide.

During the month of February 1953 there had been considerable snowfall and on each of the two days preceding the accident there had been thawing conditions. At the time of the accident, the morning of February 25, 1953, it was freezing and the streets and sidewalks were generally icy and slippery. The plaintiff took a bus to the downtown area and got off at the intersection of Nicollet Avenue and Eleventh Street. She proceeded to walk in an easterly direction on the south side of Eleventh Street from Nicollet Avenue toward Marquette

---

[2] The manager of the theater estimated the distance between the extreme downspouts located at each end of the cornice to be 70 feet, whereas the city building inspector testified that the lower cornice was "about 50 feet wide."

Avenue. A drugstore is located on the corner of Eleventh and Nicollet, which is separated from the Lyceum by an open space about 14 feet wide. The plaintiff testified that it was "slippery" in front of the drugstore but that it was "bumpy" and "rough" in front of the Lyceum. She walked past the portico and was almost to the most easterly door of the building when she turned her ankle on a piece of rough ice, slipped, and fell. While there is some dispute as to precisely where the plaintiff fell, it appears that it was just a few feet past the most easterly pillar and downspout adjacent thereto.

■ The only question before this court is whether there is any substantial evidence to sustain the verdicts.[3] Plaintiffs contend that the defendants negligently permitted moisture to run down the drain pipes and drip over the cornices of the building onto the sidewalk. This water, they claim, together with the snow and other water on the sidewalk, froze and created a hazardous condition causing plaintiff's fall.

As a general rule an abutting owner or occupant of property owes no duty to pedestrians to keep the sidewalk safe from the hazards of ice and snow which have *naturally* accumulated thereon,[4] in the absence of a statute imposing such duty.[5] This is true even though dangerous ridges are formed as a result of normal vehicular or pedestrian traffic.[6] Where, however, the accumulation of ice and snow is

[3] Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395.

[4] Graalum v. Radisson Ramp, Inc. 245 Minn. 54, 71 N. W. (2d) 904; Bentson v. Berde's Food Center, Inc. 231 Minn. 451, 44 N. W. (2d) 481, 22 A. L. R. (2d) 733; McDonough v. City of St. Paul, 179 Minn. 553, 230 N. W. 89; Boecher v. City of St. Paul, 149 Minn. 69, 182 N. W. 908; Western Auto Supply Agency v. Phelan (9 Cir.) 104 F. (2d) 85.

[5] It is generally held, however, that even where there is a snow-removal law the abutting landowner is not civilly liable to third persons for violations thereof. See, e. g., Dunn v. J. P. Stevens & Co. (2 Cir.) 192 F. (2d) 854, 855; Burke v. Columbia Lbr. Co. (D. Alaska) 108 F. Supp. 743; Radinsky v. Ellis, 83 App. D. C. 172, 167 F. (2d) 745.

[6] See, Abar v. Ramsey Motor Service, Inc. 195 Minn. 597, 263 N. W. 917 (vehicular traffic); McDonough v. City of St. Paul, 179 Minn. 553, 230 N. W. 89 (vehicular and pedestrian traffic); Boecher v. City of St. Paul, 149 Minn. 69, 182 N. W. 908 (pedestrian traffic).

due to *artificial* causes, the abutting landowner may be liable for injuries resulting therefrom.[7] As we said in Graalum v. Radisson Ramp, Inc. 245 Minn. 54, 60, 71 N. W. (2d) 904, 908:

"\* \* \* If \* \* \* an abutting owner maintains or uses his property in a manner whereby dangerous ice is caused to form on the adjacent sidewalk as a result of artificial, as distinguished from natural, causes, he is liable for injuries proximately caused to a pedestrian who slips and falls on such ice."

A more difficult problem arises where the dangerous condition is created by a combination of natural and artificial causes as plaintiffs claim occurred in the instant case. Certainly if a defendant's acts had little or no effect on the hazard already existing by reason of natural accumulations of ice and snow, it cannot be said that his conduct proximately caused the injury.[8] On the other hand, if the defendant increases the hazard that otherwise normally exists during winter months by introducing a "new element of danger," he may be held liable.[9] For example, in Johnson v. Elmborg, 165 Minn. 67, 70, 205 N. W. 628, 629, we affirmed a verdict for the plaintiff where the evidence showed that water from a defective drain pipe had formed ice on the sidewalk and that the sidewalk "was worst at the drain pipe." The burden is on the plaintiff to show this causal relationship.[10]

---

[7]Johnson v. Elmborg, 165 Minn. 67, 205 N. W. 628; see, Abar v. Ramsey Motor Service, Inc. 195 Minn. 597, 602, 263 N. W. 917, 919; Annotation, 34 A. L. R. 409.

[8]See, e. g., Greenlaw v. Milliken, 100 Me. 440, 62 A. 145; Realty & Mtge. Co. v. Ulrich, 164 Md. 666, 165 A. 708; Jefferson v. L'Heureux, 293 Mass. 490, 200 N. E. 355; Miller v. Exeter Borough, 366 Pa. 336, 77 A. (2d) 395. Cf. Cook v. Person, 246 Minn. 119, 74 N. W. (2d) 389.

[9]Taggart v. Bouldin, 111 N. J. L. 464, 467, 168 A. 570, 571, quoted with approval in Hecht Co. v. Hohensee, 65 App. D. C. 328, 329, 83 F. (2d) 585, 586. See, also, Dunn v. J. P. Stevens & Co. (2 Cir.) 192 F. (2d) 854, 855; Dow v. Interborough Rapid Transit Co. 185 App. Div. 10, 172 N. Y. S. 623. In Davis v. United States (2 Cir.) 208 F. (2d) 863, 865, Judge L. Hand indicated that the "line of cleavage" in determining liability may be "whether the owner has physically changed the surface that causes the fall from a safe to a dangerous one."

[10]See cases cited in footnote 8, *supra*.

Applying the foregoing principles to the instant case, it follows that liability can be imposed only if it is shown that (a) the defendants negligently caused water to accumulate and freeze on the sidewalk; and (b) the artificial accumulation was an efficient cause of the dangerous condition which occasioned the injury. Both of these are questions of fact to be resolved by the trier of fact.[11] If its determinations are sufficiently supported by the evidence, viewed in a light most favorable to the verdicts, and the inferences reasonably deducible therefrom, they cannot be disturbed on appeal.[12]

■ The primary evidence regarding the discharge of water from the Lyceum building onto the sidewalk is the testimony of the plaintiff. According to her, during previous thawing periods,[13] water had "dripped" on the sidewalk from the lower cornice although it is not clear whether the water dripped merely from the easterly corner of the cornice or along its entire length. She supposed that the upper cornice also dripped but "was aware of the fact that this one [lower cornice] dripped." The plaintiff could offer no evidence of dripping from the ledge going across the entire building at roof level because "I don't think I looked that far up." Nor is there anything in her testimony to indicate the extent of the "dripping" she had observed.

Her testimony is also somewhat meager regarding the discharge of water from the downspouts. While she had not seen water coming out of the spouts, "[t]here was water coming down around the [easterly] spout" which collected in the holes on the sidewalk.

The custodian of the Lyceum building testified, on behalf of the defendants, that during the 26 years he had been working for the theater he had never seen any water dripping from the cornices, nor coming down the spouts during the last several years. The manager of the theater also testified that he had never witnessed any dripping

---

[11]See. e. g., Hooper v. Kennedy, 320 Mass. 576, 70 N. E. (2d) 529; Cochran v. Barton, 233 Mass. 147, 123 N. E. 505; Allen v. Kansas City (Mo. App.) 64 S. W. (2d) 765; Douglas v. Johnson, 16 N. Y. S. (2d) 644.

[12]Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395; Cofran v. Swanman, 225 Minn. 40, 43, 29 N. W. (2d) 448, 450; 1 Dunnell, Dig. (3 ed.) § 415.

[13]Plaintiff was unable to testify as to any dripping during the thawing conditions immediately preceding the accident.

from the cornices except maybe "a drop falling occasionally." As to the downspouts, he testified that while he had never seen any water discharging from the easterly downspout, he had seen it damp during thawing periods. Any water coming from the westerly downspout, which was also damp at times, would flow into the grate in the sidewalk. The chief building inspector for the city testified, in answer to a hypothetical question, that if water accumulated at the top of the deteriorated downspouts, some of it would eventually seep out through the debris and run down the outside of the spout. Several witnesses agreed that the center downspout was open and that water discharging from it would go onto the sidewalk, although the evidence does not disclose whether any material amount of water did, in fact, flow through the center downspout during thawing periods.

This evidence obviously leaves much to be desired. Under the most liberal view, and resolving all conflicts in the plaintiffs' favor, the evidence can, at best, only support a finding that water of an unknown quantity had, during thawing conditions, come down around the easterly downspout onto the sidewalk and had dripped from the lower cornice. It would also seem that water could and perhaps did flow down the center downspout. The amount of water discharged on the sidewalk in either fashion is, under the evidence, left in the realm of speculation. However, the jury could properly conclude, from this evidence, that the defendants negligently caused *some* water to accumulate and freeze on the sidewalk in the area of the easterly downspout and along the area under the lower cornice, including the vicinity of the center downspout.

■ It is conceded in the instant case that there was a natural accumulation of ice and frozen snow on the sidewalk. As previously pointed out, it was incumbent upon the plaintiffs to show that the discharge of water from the defendants' property, assuming there was some, rendered the condition of the sidewalk more dangerous than it already was by reason of natural causes. The lack of direct evidence in this regard is not fatal. In Bannister v. George H. Hurd Realty Co. 131 Minn. 448, 155 N. W. 627, there was a similar lack of direct evidence to support plaintiff's contention that a ridge of ice on which she tripped was caused by snow falling on a slanting cellar door pro-

jecting out into the sidewalk. Nevertheless, we held that, because of the inclined surface of the door, thawing conditions, and absence of similar ridges elsewhere, the jury could fairly infer that the accumulation of ice was caused by the cellar door.[14]

However, in the instant case, the only evidence from which the jury could infer that the defendants' negligence increased the hazard is the following testimony of the plaintiff, which she repeated in various contexts:

"Q. You spoke of the ice on the sidewalk there not only being ice, but being rough in front of the Lyceum. Where did that roughness commence, if you recall?

"A. Oh, it had been rough—the entire front of the theater was rough.

"Q. Was that different than it had been back to the east, before you got to the theater building—or to the west, I mean?

"A. West. It would have been just slippery. It wasn't as rough."

On cross-examination she testified:

"Q. * * * And the entire length of the sidewalk from the south side of 11th Street from Nicollet to Marquette was about the same, was it not?

> * * * * *

"A. No, it was slippery in front of the drug store on the corner, but it was bumpy in front of the theater.

> * * * * *

"Q. Now, in walking along the sidewalk in front of the theater, did you choose that part of the sidewalk which appeared to you to be the safest?

"A. The entire area was bumpy and irregular.

"Q. There was no difference. Well, to sum it up, the entire area of the sidewalk for the entire length of the front of the theater was the same, is that right?

"A. I think so."

If the bumpy and rough area had been localized at the points where

---

[14]See, also, e. g., Dow v. Interborough Rapid Transit Co. 185 App. Div. 10, 172 N. Y. S. 623.

there was evidence of some water discharging, i. e. at the easterly downspout, near which spout the plaintiff fell, or the area underneath the first cornice, or the center downspout, there would have been some justification for inferring that the bumpy condition, as distinguished from the general slippery condition, was attributable to the defendants' negligence. But the hazard caused by the rough and uneven ice extended along the entire front of the building traversed by the plaintiff, an area approximately 120 feet long and 10 feet wide. There is no evidence of any water discharging on the westerly portion of this area, nor is there any evidence that the downspouts or cornices discharged water freely and in sufficient quantity to have flowed over the entire sidewalk. Moreover, the bumpy condition along the front of the Lyceum is readily explainable by the defendants' evidence that the sidewalk in front of the drugstore, referred to by the plaintiff as being merely slippery, was heated whereas the sidewalk in front of the Lyceum building was not.

We must conclude that there was no evidence, inferential or otherwise, of any substantial nature, tending to show that the defective downspouts or cornices aggravated or made more dangerous the existing hazard occasioned by natural causes. Consequently, the plaintiff has not, as a matter of law, sustained her burden of establishing a causal connection between defendants' negligence and the ridges of ice which caused her to fall. It appears, from a careful examination of the evidence before us, that the verdicts of the jury were necessarily based upon unwarranted speculation and conjecture.

It may be that sufficient evidence to support the verdicts in favor of the plaintiffs can be adduced on a new trial. Consequently we are constrained, in the interests of manifest justice, to reverse only so much of the orders appealed from as deny the defendants' motions for a new trial. Inasmuch as there is no controversy concerning the amounts of the damages awarded, the new trial is specifically limited to the issue of defendants' liability.

Reversed and new trial granted on the issue of liability.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.